1  Dale J. Giali (SBN 150382)
   dgiali@mayerbrown.com
2  MAYER BROWN LLP
   350 South Grand Avenue, 25th Floor
3  Los Angeles, CA  90071-1503
   Telephone:   (213) 229-9500
4  Facsimile:    (213) 625-0248
5
6  *Attorney for Defendant*
   *AT&T MOBILITY LLC*
7
8  **Appearances of Counsel for each**
   **Party are on Next Page and on Signature Page**
9
10
11                 **UNITED STATES DISTRICT COURT**
12          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

13  SPH AMERICA, LLC                    Case No. 3:13-cv-2318-CAB-KSC

14            Plaintiff,                **DEFENDANTS' OPENING CLAIM**
                                        **CONSTRUCTION BRIEF**
15       v.

16  AT&T MOBILITY LLC,                   Date: May 6 – May 8, 2015
                                         Place: 221 West Broadway, Courtroom 4C
17
            Defendant.
18

19  SPH AMERICA, LLC

20            Plaintiff,

21       v.

22  HUAWEI TECHNOLOGIES CO.,            Case No. 13-CV-2323-CAB-KSC
    LTD., et al.
23

24            Defendants.

25

26

27

28

4832-9016-1442.1

1

2   SPH AMERICA, LLC

3           Plaintiff,

4       v.                              Case No. 3:13-cv-2320-CAB-KSC

5   RESEARCH IN MOTION, LTD,
    D/B/A BLACKBERRY LIMITED
6

7           Defendant.

8   SPH AMERICA, LLC

9
            Plaintiff,
10
        v.                              Case No. 3:13-cv-2324-CAB-KSC
11

12  T-MOBILE US, INC.,

13          Defendant.

14  SPH AMERICA, LLC

15
            Plaintiff,
16
        v.
17                                      Case No. 3:13-cv-2325-CAB-KSC

18  CELLCO PARTNERSHIP d/b/a
    VERIZON WIRELESS,
19

20          Defendant.

21  SPH AMERICA, LLC,

22
            Plaintiff,
23
        v.                              Case No. 3:13-cv-2326-CAB-KSC
24

25  ZTE CORP., ET AL.,

26          Defendants.

27

28

James R. Asperger (Bar No. 083188)
jimasperger@quinnemanuel.com
Heather Belville (Bar No. 262328)
heatherbelville@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: 650-801-5000
Facsimile: 650-801-5100

Eric Huang (admitted *pro hac vice*)
erichuang@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100

Jordan R. Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: 415-875-6600
Facsimile: 415-875-6700

*Attorneys for Defendant BLACKBERRY LIMITED
F/K/A RESEARCH IN MOTION LIMITED*

Callie Bjurstrom (CA SBN 137816)
callie.bjurstrom@pillsburylaw.com
Steven A. Moore (CA SBN 232114)
steve.moore@pillsburylaw.com
Inge Larish (CA SBN 276720)
inge.larish@pillsburylaw.com
Nicole S. Cunningham (CA SBN 234390)
nicole.cunningham@pillsburylaw.com
Richard Thill (CA SBN 236409)
richard.thill@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 West Broadway, Suite 1100
San Diego, CA 92101-3575
Telephone:  619-544-5000; Facsimile:  619-819-4418

Attorneys for Defendant and Counter-Plaintiff
ZTE(USA) INC.


Dale J. Giali (SBN 150382)
dgiali@mayerbrown.com
MAYER BROWN LLP
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone:   (213) 229-9500
Facsimile:    (213) 625-0248

Amr O. Aly (*pro hac vice*)
MAYER BROWN LLP
aaly@mayerbrown.com
1675 Broadway
New York, NY 10019
Telephone:  (212) 506-2304
Facsimile:  (212) 775-8818

Stephen E. Baskin (*pro* hac vice)
MAYER BROWN LLP
sbaskin@mayerbrown.com
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone:  (202) 263-3000
Facsimile:  (202) 263-3300

1  Edward D. Johnson (SBN 189475)
2  MAYER BROWN LLP
   wjohnson@mayerbrown.com
3  Two Palo Alto Square, Suite 300
   3000 El Camino Real
4  Palo Alto, CA 94306-2112
5  Telephone:  (650) 331-2000
   Facsimile:  (650) 331-2060
6
7  *Attorney for Defendant*
   *AT&T MOBILITY LLC*
8

9
10  Michael J. Newton (CA SBN 156225)
    mike.newton@alston.com
11  ALSTON & BIRD LLP
    2828 N. Harwood St., Suite 1800
12  Dallas, TX 7520
13  Telephone:  214-922-3400
    Facsimile:   214-922-3899
14
15  Ross R. Barton (*pro hac vice*)
    ross.barton@alston.com
16  ALSTON & BIRD LLP
17  101 S. Tryon St., Suite 4000
    Charlotte, NC 28280
18  Telephone:  704-444-1000
19  Facsimile:  704-444-1677

20  *Attorneys for Defendants T-Mobile US, Inc.*
21  *and Cellco Partnership d/b/a Verizon Wireless*

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .......................................................................................... 1

II.     BACKGROUND FACTS ............................................................................. 2

III.    LEGAL STANDARDS ................................................................................ 4

IV.    LEVEL OF ORDINARY SKILL IN THE ART ........................................ 5

V.     CONSTRUCTION OF DISPUTED CLAIM TERMS ............................... 5

        A.     The '029 Patent ................................................................................. 5

               1.     '029 Patent Background .................................................... 5

               2.     Construction of the Disputed Term .................................. 6

                      (a)     "dual-channel QPSK modulator/modulating" .................... 6

        B.     The '906/'173 Patents ...................................................................... 13

               1.     '906/'173 Patents Background ......................................... 13

               2.     Construction of Disputed Claim Terms ......................... 14

                      (a)     "channel coding means for . . ." .......................... 15

                      (b)     "code generating means for . . ." ......................... 17

                      (c)     "spreading means for . . ." .................................. 19

                      (d)     "first spreading code generation means . . ." and
                              "second spreading code generation means . . ." ............... 21

                      (e)     "second logical operation  means . . . for carrying
                              out . . ." and "first logical operating means . . . for
                              carrying out . . ." ............................................... 22

                      (f)     "second selection means for . . ." and "first selection
                              means for . . ." .................................................. 23

1

## TABLE OF CONTENTS (CONTINUED)

2
**Page**

3

4
    (g)    Dependent Claims 16 and 18 ............................................24

5
    (h)    "counting means for consecutively producing a
6
           count value in synchronization with a clock signal"........26

7
    (i)    "plurality of data channels"...............................................29

8
    (j)    "a counter".......................................................................30
9

10
    (k)    "consecutively producing a count value in
           synchronization with a clock signal" ...............................30
11

12
    (l)    "a channel coding unit that encodes the source data
           to generate a plurality of data parts and a control
13
           part, wherein the data parts are allocated to the data
           channels and the control part is allocated to the
14
           control channel" ...............................................................33

15
    (m)   "a second selector that outputs the spreading code to
16
           be allocated to the control channel in response to a
           second select signal" .......................................................37
17

18
C.    The '253/'530/'591 Patents.................................................38

19
    1.    '253/'530/'591 Patents Background............................38

20
    2.    Construction of the Disputed Terms...........................39

21
    (a)    "broadcast[ed]" / "broadcast signal" ................................39

22
VI.    CONCLUSION ...........................................................................44
23

24

25

26

27

28

4832-9016-1442.1

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Biomedino, LLC v. Waters Technology Corp.*,
490 F.3d 946 (Fed. Cir. 2007) ........................................................................... 14

*Competitive Technologies v. Fujitsu*,
286 F.Supp. 2d 1161 (N.D. Cal. 2003) .......................................................... *passim*

*Digital Tech. Licensing, Inc. v. Cingular Wireless, LLC*,
Case No. 2:06-CV-156, 2007 WL 2300792 (E.D. Tex. Aug. 7,
2007) ............................................................................................................. 15, 19

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009) ............................................................................. 4

*Griffin v. Bertina*,
285 F.3d 1029 (Fed. Cir. 2002) ........................................................................... 15

*Intergraph Hardware Technologies Company v. Toshiba Corp.*,
508 F.Supp. 2d 752 (N.D. Cal 2007) .................................................. 16, 19, 20, 23

*Krippelz v. Ford Motor Co.*,
667 F.3d 1261 (Fed. Cir. 2012) ............................................................................. 5

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
355 F.3d 1361 (Fed. Cir. 2004) ............................................................................. 4

*Mas-Hamilton Group v. LaGard, Inc.*,
156 F.3d 1206 (Fed. Cir. 1998) ........................................................................... 35

*Mass. Inst. Of Tech. v. Abacus Software*,
462 F.3d 1344 (Fed. Cir. 2006) ........................................................................... 35

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*,
671 F.3d 1291 (Fed. Cir. 2012) ........................................................................... 28

*Mformation Tech. v. Research in Motion Ltd.*,
764 F. 3d 1392 (Fed. Cir. 2014) ......................................................................... 33

*Minks v. Polaris Indus., Inc.*,
546 F.3d 1364 (Fed. Cir. 2008) ..................................................................... 27, 28

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*MySpace, Inc. v. Graphon Corp.*,
    672 F.3d 1250 (Fed. Cir. 2012) ........................................................................... 4

*O2 Micro International v. Beyond Innovation Technology Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ......................................................................... 29

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...................................................................... 4, 5

*Robert Bosch, LLC v. Snap-On Inc.*,
    769 F.3d 1094 (Fed. Cir. 2014) .................................................................. 34, 35

*SanDisk Corp. v. Memorex Prods., Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005) ........................................................................... 5

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ........................................................................... 4

*SPH America LLC v. Acer, Inc. et al.*,
    No. 3:09-cv-02535-CAB-KSC, Dkt. No. 698 ................................................ 3, 4

*Springs Window Fashions LP v. Novo Indus., L.P.*,
    323 F.3d 989 (Fed. Cir. 2003) ............................................................................. 7

*Talbert Fuel Sys. Patents Co. v. Unocal Corp.*,
    275 F.3d 1371 (Fed. Cir.), *vacated and remanded on other grounds*,
    537 U.S. 802 (2002) ......................................................................................... 43

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ....................................................................... 42

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................................. 4

*Welker Bearing Co. v. PHD, Inc.*,
    550 F.3d 1090 (Fed. Cir. 2008) .................................................................. 34, 35

**Statutes**

35 U.S.C. § 112 ............................................................................................. passim

**Other Authorities**

Local Rule 4-1 .................................................................................................. 26

Local Rule 5.4 .................................................................................................. 48

1

## TABLE OF ABBREVIATIONS

2

**'029 pat.** – U.S. Patent No. 5,960,029.

3

**'906 pat.** – U.S. Patent No. 7,443,906

4

**'173 pat.** – U.S. Patent No. 8,121,173 (a continuation of the '906 patent)

5

**RACH pats.** – U.S. Reissue Patent Nos. 40,253, 44,530, and 44,591

6

**CDMA** – Code Division Multiple Access

7

**ETRI** – Electronics Telecommunications Research Institute of Korea

8

**PN code** – pseudonoise code or pseudorandom noise code

9

**PTO** – United States Patent and Trademark Office

10

**QPSK** – Quaternary (or Quadrature) Phase Shift Keying

11

**RACH –** random access channel

12

**SPH** – Plaintiff, SPH America, LLC

13

**Defendants** – Huawei Technologies Co., Ltd., Huawei Device USA, Inc., Futurewei

14

Technologies, Inc., BlackBerry Limited, ZTE (USA) Inc., AT&T

15

Mobility LLC, T-Mobile US, Inc., and Cellco Partnership d/b/a

16

Verizon Wireless

17

18

19

20

21

22

23

24

25

26

27

28

4832-9016-1442.1

# I.    INTRODUCTION

Pursuant to the Court's Amended Case Management Order Re: Claim Construction Schedule (Dkt. No. 68), Defendants submit their Opening Claim Construction Brief concerning U.S. Patent Nos. 5,960,029, 7,443,906, 8,121,173 and U.S. Reissue Patent Nos. 40,253, 44,530, and 44,591.

Although the technology in this case may appear complex, the arguments of the parties reduce down to a series of fairly straightforward disputes between the parties. Plaintiff, along with its backer, the Electronics and Telecommunications Research Institute of Korea (hereafter "ETRI"), spent years navigating many of the patents-in-suit through ex parte reexaminations, reissue proceedings, and numerous prior lawsuits, but now ask the Court to ignore this history. Instead, Plaintiff asks the Court to adopt constructions that ignore the patentee's express statements during the years of examination, reexamination, and reissue, and to ignore the unequivocal contents of the specifications. These patents – more than most – reflect years of considered statements and actions affecting their claim scope, and the Defendants simply ask the Court to give force to the calculated statements and elections of the patentees.

Defendants' constructions are consistent with and properly reflect the long histories of the patents-in-suit. They are supported by the intrinsic record and reflect the careful bargain struck by the patentees and the Patent and Trademark Office. Each proposed construction conveys the proper scope of the patent claims as defined by the claim language, specification, and statements made by the patentee itself during prosecution. Defendants' proposed constructions are also consistent with the understanding of one of ordinary skill the in the art, as shown by Defendants' expert and the testimony of the named inventors themselves.

Plaintiff's constructions, on the other hand, seek to ignore these statements and improperly broaden the scope of the patents-in-suit. Plaintiff's tactics include ambiguously referring to corresponding structure to increase uncertainty concerning

1

the scope of the claim, or contradicting its own statements during reexamination proceedings.  Plaintiff's constructions and arguments are also inconsistent with the understanding of one of ordinary skill in the art.  Tellingly, even Plaintiff's own expert appears to take issue with Plaintiff's constructions, undermining Plaintiff's proposals in several instances and outright agreeing with the Defendants' proposal in another instance.

For the reasons set out below, Defendants' respectfully request that their proposed constructions be adopted.

## II.     BACKGROUND FACTS

On September 26, 2013, Plaintiff filed seven separate Complaints against AT&T, BlackBerry, Huawei, Sprint, T-Mobile, Verizon Wireless, and ZTE. Plaintiff originally asserted five patents against AT&T, BlackBerry, Huawei, T-Mobile, and ZTE, and only two of those five patents against Sprint and Verizon Wireless.  On January 3 and 9, 2014, Plaintiff filed First Amended Complaints adding additional patents against each Defendant.  In its First Amended Complaints, Plaintiff asserted an additional four patents against BlackBerry, Huawei, ZTE, Sprint, Verizon, AT&T and T-Mobile; and one more additional patent against AT&T and T-Mobile.  Finally, on August 1, 2014, Plaintiff filed a Supplemental First Amended Complaint adding additional theories of indirect infringement against the seven Defendants and withdrawing one of the patents previously asserted against Sprint and Verizon Wireless.  Plaintiff is presently asserting five patents against Sprint and Verizon, ten patents against AT&T and T-Mobile, and nine patents against BlackBerry, Huawei, and ZTE.  The five patents asserted against Sprint and Verizon Wireless, and the nine patents asserted against BlackBerry, Huawei, and ZTE, are all included in the ten patents asserted against AT&T and T-Mobile.  The first seven cases filed have been consolidated for purposes of discovery and claim construction pursuant to the Court's March 18, 2014 Case Management Conference Order ("March CMC Order").  Dkt. No. 25.

1    The ten patents that Plaintiff has asserted across all seven cases are U.S.

2  Patent Nos. RE 40,385 ("the '385 patent"), RE 44,507 ("the '507 patent"),

3  7,443,906 ("the '906 patent"), 8,121, 173 ("the '173 patent"), 5,860,029 ("the '029

4  patent"), RE 40,253 ("the '253 patent"), RE 44,530 ("the '530 patent"), RE 44,591

5  ("the '591 patent"), 8,532,231 ("the '231 patent"), and 8,565,346 ("the '346

6  patent").  The Court broke the patents into three Groups (I, II, and III) for purposes

7  of infringement and invalidity contentions.  Dkt. No. 25.  The patents were grouped

8  as follows:  Group I: the '385 patent, the '507 patent, the '906 patent, and the '173

9  patent; Group II: the '029 patent, the '253 patent, the '530 patent, and the '591

10  patent; Group III: the '231 patent and the '346 patent.  *Id.*

11    On October 6, 2014 and November 3, 2014, Defendants ZTE and Huawei

12  Device USA, Inc. filed petitions with the U.S. Patent and Trademark Office

13  requesting *inter partes* review ("IPR") of four of the ten patents-in-suit in this

14  litigation.  The four patents-in-suit for which *inter partes* review petitions are

15  pending before the U.S. Patent and Trademark Office are U.S. Patents RE40,385;

16  RE44,507; 8,565,346; and 8,532,231.  Following a hearing on this matter on

17  December 5, 2014, the Court stayed the consolidated cases as to these four patents.

18  *See* Dkt. No. 54 at 3.  Therefore, the only patents that are currently at issue in the

19  claim construction process are the '906 patent, the '173 patent, the '029 patent, the

20  '253 patent, the '530 patent, and the '591 patent.

21    This is not the first time this Court has dealt with the non-stayed patents for

22  purposes of claim construction.  In the *SPH America LLC v. Acer, Inc. et al.* case,

23  this Court held a claim construction hearing, and issued a claim construction order

24  for the '906 patent, the '029 patent, and the '253 patent.  Order on Agreed Claim

25  Constructions and Claim Construction Rulings from April 10-11, 2012 Markman

26  Hearing, *SPH America LLC v. Acer, Inc. et al.*, No. 3:09-cv-02535-CAB-KSC, Dkt.

27  No. 698.  Attached hereto as Exhibits A and B are true and correct copies of the

28

4832-9016-1442.1

1  transcripts from the Claim Construction hearing for the *SPH America LLC v. Acer,*

2  *Inc. et al.* case held on April 10 and April 11, 2012.

3  **III.   LEGAL STANDARDS**

4          While the Court is likely familiar with the basic tenets of claim construction,

5  Defendants briefly summarize the relevant precedent here for the Court's

6  convenience.  "It is well-settled that, in interpreting an asserted claim, the court

7  should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including

8  the claims, the specification and, if in evidence, the prosecution history."  *Liquid*

9  *Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004).  "In

10  most situations, an analysis of the intrinsic evidence alone will resolve any

11  ambiguity in a disputed claim term.  In such circumstances, it is improper to rely on

12  extrinsic evidence."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583

13  (Fed. Cir. 1996).  "The specification is always highly relevant to the claim

14  construction analysis.  Usually, it is dispositive; it is the single best guide to the

15  meaning of a disputed term."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed.

16  Cir. 2005) (quoting *Vitronics*, 90 F.3d at 1582).

17          "An inventor is entitled to claim in a patent what he has invented, but no

18  more."  *MySpace, Inc. v. Graphon Corp.,* 672 F.3d 1250, 1256 (Fed. Cir. 2012).  For

19  example, where the specification clearly limits the invention to a particular form, the

20  claims should be construed consistently with that limitation.  *Edwards Lifesciences*

21  *LLC v. Cook Inc.,* 582 F.3d 1322, 1329 (Fed. Cir. 2009).  "Where the specification

22  makes clear that the invention does not include a particular feature, that feature is

23  deemed to be outside the reach of the claims of the patent, even though the language

24  of the claims, read without reference to the specification, might be considered broad

25  enough to encompass the feature in question."  *SciMed Life Sys., Inc. v. Advanced*

26  *Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1341 (Fed. Cir. 2001).

27          "When the patentee makes clear and unmistakable prosecution arguments

28  limiting the meaning of a claim term in order to overcome a rejection, the courts

1    limit the relevant claim term to exclude the disclaimed matter." *SanDisk Corp. v.*

2    *Memorex Prods., Inc.,* 415 F.3d 1278, 1286 (Fed. Cir. 2005). "A patentee's

3    statements during reexamination can be considered during claim construction, in

4    keeping with the doctrine of prosecution disclaimer." *Krippelz v. Ford Motor*

5    *Co.,* 667 F.3d 1261, 1266 (Fed. Cir. 2012).

6    **IV.    LEVEL OF ORDINARY SKILL IN THE ART**

7         Claim construction is performed from the perspective of one of ordinary skill

8    in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en

9    banc); 35 U.S.C. § 112, ¶1. Between 1995 and 2000, when the applications leading

10   to the issuance of the patents-in-suit were filed, one of ordinary skill in the art would

11   have had one of the following: (i) a Master's degree in electrical engineering,

12   computer science, or mathematics, with four years of experience in

13   telecommunications, and two years of that experience being in the field of CDMA

14   communications; or (ii) a Ph.D. in electrical engineering or a related field and one

15   year of experience in CDMA communications. Decl. of Dr. Stephen Wicker, Ph.D.

16   at ¶¶ 34-45, hereafter "Wicker Decl."

17   **V.    CONSTRUCTION OF DISPUTED CLAIM TERMS**

18        **A.    The '029 Patent**

19            **1.    '029 Patent Background**

20        The '029 patent purports to provide a novel solution for modulating radio

21   waves using a particular technique called QPSK, which stands for Quadrature Phase

22   Shift Keying. As relevant to the parties' dispute, this technique allows radio waves

23   to be formed into four different particular signals, each of which can carry one piece

24   of data. At a high level, QPSK is a technique to embed four different pieces of data

25   on a radio wave by having the wave in a particular form (termed its "phase").

26   QPSK is in contrast to other modulation techniques such as BPSK, or Binary Phase

27   Shift Keying, which allows only two different pieces of data to be embedded on a

28   radio wave. Wicker Decl. at ¶139. As part of QPSK modulation, signals are split

5

1   up onto two channels, referred to as the "I" and the "Q" channels that each carry two

2   pieces of the data to be transmitted.  The I channel has two pieces of data, and the Q

3   channel has the other two.  The final step of QPSK modulation is adding together

4   the I and Q channels to have one combined radio wave carrying all four pieces of

5   data.  A simplified diagram depicting QPSK modulation as known in the art before

6   the alleged '029 priority date is shown below:



16  Wicker Decl. at ¶140; *see also* Ex. 3 to Lee Depo. at Fig. 1(a).

17       The '029 patent purports to distinguish itself from QPSK modulators known

18  in the art by allegedly describing a new variant of a "dual channel" QPSK

19  modulator.  This is distinguished from a so-called "balanced" architecture, depicted

20  above, where the same data is fed to the I and Q channels.  For "dual channel," two

21  different data signals are presented to the I and Q channels, also referred to as

22  "branches."  '029 pat. at 1:56-65.

23           **2.    Construction of the Disputed Term**

24           (a)    **"dual-channel QPSK modulator/modulating"**[1]

25

26   _____

27       [1] The parties agree that dual-channel QPSK modulating means "modulating

28   using a dual-channel modulator."

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| a modulator where two distinct, independent data streams are separately presented to the I and Q branches and remain independent throughout the modulator. | a modulator where two distinct, independent data streams are Walsh coded and presented to the I and Q branches of a QPSK spreader.  Different signals are presented to the I and Q branches. |

The parties agree on many elements, including that two distinct, independent data streams are separately presented to the I and Q branches of the modulator.  The parties have one fundamental dispute, however: whether those data streams "remain independent throughout the modulator."  Defendants' construction requires this, Plaintiff's does not.  As shown below, Defendants' construction is compelled by the patentee's own statements in reexamination, which were the only basis to distinguish the cited prior art over the claims of the '029 patent.  Without the distinction offered by the Defendants, the patentee's statements to the PTO would be rendered a nullity, in effect returning to the patentee disclaimed subject matter to overcome prior art, which is directly contrary to Federal Circuit authority.  *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.  A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement.").

In particular, the dispute for this term focuses on whether the distinct and independent data streams provided as inputs to the claimed QPSK modulator need only be distinct and independent when they are multiplied by different Walsh codes ($W^I(n)$ and $W^Q(n)$) in multipliers 13 a and 13b of the modulator, or whether the data streams need to remain independent through the point where they are modulated by the sine and cosine signals in multipliers 17 a and 17b of the modulator (as shown in

7

1   the annotated version of Figure 1 below, which identifies the claim elements

2   corresponding with particular structures).

3



18   In the preferred embodiment of Figure 1, $X^I_j(n)$ (shown on the left hand side

19   of the Figure), is input data for the I-channel of QPSK modulator and $X^Q_j(n)$ is

20   input data for the Q-channel. *See* '029 pat. at 1:43-44. The independent and distinct

21   data streams are multiplied by the chip energy, $\sqrt{(E_{c,j})}$, before being Walsh-coded by

22   the multipliers 13a and 13b, respectively. *Id.* at 4:4-24. Thereafter, the Walsh-

23   coded I-channel data stream is added to a pilot signal using adder 14, and the

24   combined I-channel signal is pseudo-modulated in multiplier 15a, pulse shaped in

25

26

27

28

8

pulse shaping filter 11a, and provided to the multiplier 17a of the QPSK modulator.[2] *Id.*  Importantly, after being Walsh coded, the I-channel data stream is not fed into or combined in any way with the Q-channel data stream (shown in the lower half of Figure 1).  That is, the distinct and independent data stream inputs for the I and Q-channels remain independent throughout the modulator.  *See* Wicker Decl. at ¶143. As explained in detail below, Plaintiff seeks to reclaim, via their proposed construction, an interpretation that is clearly incorrect based on its statements made during reexamination.

After the '029 patent issued, a request for reexamination was filed in 2009. Ex. C.  During the reexamination of the '029 patent, a number of prior art references were considered that depicted modulator structures similar to what is shown in Figure 1 of the '029 patent.  *See, e.g.*, Ex. D, Attachment 2 to the Ex Parte Reexamination Request.  The Patent Owner's representatives sought to distinguish these prior art references by focusing, in part, on the difference between "dual-channel" and "balanced" QPSK modulators.  *See* Ex. E, Response to Final Office Action Mailed April 23, 2010 in Ex Parte Reexamination.

One of the prior art references that the Patent Owner's representatives sought to distinguish was U.S. Patent No. 5,103,459 ("Gilhousen").  *See* Ex. F, Gilhousen. An annotated version of Gilhousen Figure 4, which was included in Attachment 2 to the Ex Parte Reexamination Request, is shown in the Wicker Declaration on page 43.

Like the modulator in Figure 1 of the '029 patent, the modulator in Gilhousen Figure 4 receives multiple different signals with distinct and independent data streams, including a pilot channel and two data channels (voice channels (i) and (j))

_____

[2] Similarly, the Walsh coded Q-channel data stream is pseudo-modulated in multiplier 15b, pulse shaped in pulse shaping filter 11b, and provided to the multiplier 17b of the QPSK modulator.

9

1   as inputs.  Wicker Decl. at ¶146.  The voice channel data comprise two distinct,

2   independent data streams that are Walsh coded by the exclusive-OR gates 252i and

3   252j (labeled as the first and second Walsh spreading means in the annotated

4   figure).  *Id.*  After being Walsh coded, these distinct and independent data streams

5   are provided to the exclusive-OR gates 256i, 258i, 256j, and 258j, where they are

6   pseudo-modulated by PN sequences generated PN generators 196 and 198.  *Id.*

7        Unlike Figure 1 of the '029 patent, however, ***each*** data stream is provided to

8   ***both*** the I- and Q-channels, rather than supplying only one data stream to each of the

9   I- and Q-channels.  *Id.* at ¶147.  Thus, while the inputs to the Gilhousen modulator

10  comprise two distinct and independent data streams, these data streams do not

11  remain independent through the cosine and sine modulation performed by

12  multipliers 290 and 288 (as is the case with the data streams in Figure 1 of the '029

13  patent).  *Id.*   In Gilhousen, both data streams are ultimately provided to the cosine

14  and sine modulators, that is, both data streams are provided to the I- and Q-channels

15  of the modulator.  *Id.*  Stated another way, the data streams on the I and Q channels

16  in Gilhousen do not remain independent throughout the modulator.  The signals are

17  "mixed" together before reaching the cosine and sine modulators.  To distinguish

18  over the prior art, the modulator of the '029 patent must maintain independent data

19  streams that are not mixed together until after passing through the cosine and sine

20  modulators.

21        Because of this "mixing," the Patent Owner's representatives characterized

22  Gilhousen's modulator as "balanced," rather than "dual-channel," as claimed in the

23  '029 patent.  Ex. E, Response to Final Office Action Mailed April 23, 2010 in Ex

24  Parte Reexamination at pp. 36 and 41.  In view of the Patent Owner's statements

25  characterizing Gilhousen as disclosing balanced modulation rather than dual-

26  channel modulation, a "dual-channel QPSK modulator" as recited in claim 1 must

27  not only receive distinct and independent data streams as inputs, but these data

28  streams need to remain distinct and independent throughout the modulator.  Wicker

Decl at ¶148.  In making this unambiguous disclaimer argument, the patentee specifically disavowed any claim scope where the term "dual-channel QPSK modulator" covers modulators like that disclosed in Gilhousen.  If the "mixed" I and Q data streams of Gilhousen are "balanced" and not "dual-channel" when presented before to the PTO, the same architecture cannot now be within the definition of "dual-channel" in this Court.

Any argument that these statements were only directed to the embodiment of Figure 11 of the Gilhousen patent in an attempt to distinguish the Gilhousen reference is simply  not correct.  A fair reading of the Patent Owner's statements on pages 36 and 41 of Ex. E demonstrates that the Patent Owner was distinguishing Gilhousen generally as depicting balanced modulation, not distinguishing only the embodiment of Figure 11.[3]  Furthermore, the Examiner understood the Patent Owner's statements to be distinguishing the entirety of the Gilhousen reference as is clear from the Statements of Reasons for Patentability and/or Confirmation in the Notice of Intent to Issue Reexamination Certificate.  *See* Ex. G ("Since the claimed preambles limit the claims to the dual-channel architecture—the claimed invention is considered to be patentably distinct from Schaffner and Gilhousen.")

Independent of these statements by the Patent Owner and Examiner, the Gilhousen reference depicts a "balanced" architecture from the perspective of a person skilled in the art because the same data signals, although multiplied by different Walsh and PN codes, end up in *both* the I and Q-channels for QPSK modulation.  Plaintiff's definition improperly focuses on the Walsh-coded inputs to a "QPSK spreader" (a term that is not used in the '029 patent), rather than on the

---

[3] Figure 11 depicts the modulator in the mobile unit, whereas Figure 4 (which was the figure in Gilhousen that the Reexamination Request focused upon) depicts the modulator in the cell-site.  *See* Ex. F, Gilhousen at 5:6-7 and 21-22.  The claims of the '029 patent are not limited to a modulator at mobile unit of the communication channel.

1  signals that actually end up in the I and Q-channels of the modulator.  Wicker Decl.

2  at ¶¶153-157.  While it is true that a balanced architecture can be achieved by taking

3  a single Walsh-coded data signal, multiplying it by different PN codes and

4  supplying those signals to the sine and cosine modulation elements as shown in the

5  figure below, this is not the ***only*** way a balanced architecture can be achieved.  *Id.* at

6  ¶151.



13  A balanced architecture can also be achieved by starting with different Walsh-coded

14  data signals, A & B, multiplying them by PN codes, and then providing ***each*** of

15  these signals to ***both*** the I and Q-channels (for example, by adding them together) as

16  shown in the figure below.  *Id.*

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

4832-9016-1442.1

1   In such a scenario, like the modulator in Figure 4 of Gilhousen, a balanced

2   architecture is achieved because the same data signals (multiplied by different

3   Walsh and/or PN codes) are input to *both* the sine and cosine modulation elements

4   (*i.e.*, the I and Q-channels of the modulator).  This is true even though two distinct,

5   independent data streams are Walsh coded (A & B in the figure above) and

6   presented to the I and Q branches of a "QPSK spreader" (the structure shown in the

7   red box).

8       In view of the foregoing, Plaintiff's proposed definition does not provide a

9   consistent and complete definition of a dual-channel QPSK modulator because, in

10  some instances, it encompasses structures that are balanced QPSK modulators.

11  Wicker Decl. at ¶153-157.  Accordingly, Plaintiff's definition should be rejected

12  and Defendants' proposed definition should be adopted.

13      **B.    The '906/'173 Patents**

14          **1.    '906/'173 Patents Background**

15      The '906 and '173 patents both relate to wireless telecommunications using

16  code division multiple access ("CDMA") cellular systems.  Wicker Decl. at ¶117.

17  The '173 patent is a grandchild continuation of the '906 patent, and both share the

18  same specification.  *See* '173 patent.  Both patents disclose various schemes for

19  formatting data for wireless transmission from a mobile station, such as a cellular

20  phone or a cellular-capable laptop computer, to a wireless network.  Two-way

21  wireless mobile telecommunication involves a mobile station (*e.g.*, cellular phone or

22  computer with cellular capability) that sends and receives radio frequency ("RF")

23  signals to and from a base station.  A base station is a fixed radio station tower that

24  communicates with mobile terminals within a given geographic area, and transfers

25  communications to other base stations (or the fixed telephone network).  Wicker

26  Decl. at ¶118.

27      The '906 and '173 patents describe multiplying data by different codes, called

28  OVSF codes.  Because of the specific mathematical properties of the OVSF codes,

1  their use allows one transmitter to transmit many different data channels at the same

2  time.  The '906 and '173 patents' claims are directed to toward converting source

3  data to a channel modulated signal and the use of specific OVSF codes for different

4  channels.  '906 pat. at Abstract; 1:9-14; 17:58-59; 19:23-24.  Wicker Decl. at ¶121.

5       The modulation scheme described in the '906 and '173 patents includes (a)

6  encoding source data to generate data part(s) and a control part for allocation to data

7  channel(s) and control channel, respectively; (b) generating spreading code(s) for

8  allocation to the channels; and (c) spreading the data part(s) and control part with

9  the spreading code(s) to "thereby generate the channel-modulated signal." *Id.* at

10  Abstract.  The purportedly inventive aspect is the use of specific OVSF codes in a

11  mobile communication system.  *Id.* at 1:9-14.

## 2.  Construction of Disputed Claim Terms

13       The parties' disputes regarding the '906 means-plus-function terms primarily

14  involve two issues.  First, Plaintiff's constructions omit function-defining claim

15  language for five disputed terms: (1) "channel coding means," (2) "code generating

16  means," (3) "spreading means," (4) "first logical operation means," and (5) "second

17  logical operation means."  Plaintiff's constructions eliminate language in the

18  "wherein" and "thereby" clauses that describe the function performed.  As explained

19  below, this is improper.  Second, the parties dispute the level of specificity that

20  should be included in the proposed structure.  The specification must provide

21  adequate disclosure of structures for means-plus-function claim language and if the

22  specification omits structure, it cannot be read into the claim.  "[A] bare statement

23  that known techniques or methods can be used does not disclose structure" in the

24  context of a means-plus-function limitation.  *Biomedino, LLC v. Waters Technology

25  Corp.,* 490 F.3d 946, 952 (Fed. Cir. 2007) (disclosure that an invention "may be

26  controlled by known differential pressure, valving and control equipment" was not a

27  disclosure of any structure corresponding to the claimed "control means for

28  operating [a] valving " and the claim was held indefinite).  Defendants' proposed

1  structures properly include details from the only related disclosures in the

2  specification, and which inform one of ordinary skill in the art of the metes and

3  bounds of these means-plus-function terms.

4              (a)    **"channel coding means for . . ."**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| <u>Function</u>: encoding the source data to generate (N-1) data parts and a control part, wherein the data parts are allocated to the data channels and the control part is allocated to the control channel. <br><br> <u>Structure</u>: Encoder (110) shown in Figs. 1, 3, 5-7, and equivalents thereof. | <u>Function</u>: encoding the source data to generate (N-1) data parts and a control part). <br><br> <u>Structure</u>: encoder (110), and equivalents thereof. <br><br> The "wherein…" portion does not need further construction. |

12        The parties dispute both the function and structure for the phrase "channel

13  coding means for encoding the source data … wherein the data parts are allocated to

14  the data channels and the control part is allocated to the control channel."

15        ***Identification of the Function.***  With respect to the function, the issue is

16  whether Plaintiff can delete the "wherein" clause that it added by amendment to

17  overcome the prior art.  Under applicable case law, it cannot.

18        First, Plaintiff's construction would eliminate language that was added to

19  obtain allowance of the claim.  The limitation of the "wherein" clause here first

20  appeared in an amendment during prosecution to gain allowance of a claim.  *See* Ex.

21  H, Response to Office Action Mailed July 2, 2003.  Therefore, it is scope-limiting,

22  and it would be wrong to ignore this language in identifying the claimed function.

23  *See Digital Tech. Licensing, Inc. v. Cingular Wireless, LLC,* Case No. 2:06-CV-156,

24  2007 WL 2300792, at *5 (E.D. Tex. Aug. 7, 2007) ("whereby" clause used to

25  distinguish the invention over prior art during prosecution was not a mere result);

26  *see also Griffin v. Bertina*, 285 F.3d 1029, 1034 (Fed. Cir. 2002) (a "wherein"

27  clause in a method claim was not a mere recitation of an inherent result because it

28  expressed the inventive discovery).  Thus, it cannot be ignored in construing the

15

claims.  The entire function, including the "wherein" clause, should be included as part of the construction of this claim term.

Moreover, while it may be permissible to overlook "wherein," "whereby," and "thereby" clauses when the clauses merely state an intended result, *Lockheed Martin*, 324 F.3d at 1319; *Competitive Technologies v. Fujitsu*, 286 F.Supp. 2d 1161, 1187-1188 (N.D. Cal. 2003); *Intergraph Hardware Technologies Company v. Toshiba Corp.*, 508 F.Supp. 2d 752, 768-769 (N.D. Cal 2007), that is not the case here.  The test for distinguishing a "mere result" from additional function is whether the additional language describes a necessary result of the earlier-recited function. In *Intergraph Hardware*, for example, the Court analyzed a similar "wherein" clause: "primary memory interface means for coupling data between said primary memory and said cache memory…wherein said primary memory interface means selectively transfer data between said primary memory and said cache memory in response to a miss signal."  *Intergraph Hardware*, 508 F.Supp. at 768.  In holding that the this clause was appropriately part of the function, and not mere result, the Court reasoned that the selective transfer of data described in the "wherein" clause is a separate function performed by the primary memory interface means, not a necessary result of coupling data between primary memory and cache memory.  *Id.* at 769.  Here, similarly, the wherein clause does not self-describe itself as an effect but instead further defines a necessary part of the claimed function.

Similarly, in *Competitive Technologies,* the Court found a "thereby" clause to be part of the function.  *Competitive Techs*, 286 F.Supp. 2d at 1187-1188.  The claim term at issue was a "first switch means remaining closed to enable said panel capacitance to charge through said inductor and responsive to said panel capacitance being substantially fully charged to open and *thereby discontinue further charging*."  *Id*. at 1182 (emphasis added).  The court concluded that the "thereby" clause not only delimited how the switch means "is supposed [to] work," but also described the function of the switch means, *i.e.*, to discontinue further charging.  *Id*. at 1187-1188.

16

4832-9016-1442.1

Because the clause did not merely state a result, it was part of the function, and limited the claim scope.  *Id.*  Here the "wherein" clause defines the allocation of "data parts" and "control part" during the "encoding" function.  It does not define an intended result, but rather, critically defines the necessary routing.  Plaintiff's attempt to improperly read out the "wherein" clause from the claim should be rejected.  Accordingly, the Court should adopt Defendant's proposed function, which maintains the integrity of the claim as prosecuted.

*Identification of Corresponding Structure.*  Both parties agree that the "encoder" is part of the structure, but Defendants' proposed construction more precisely identifies the structure.  The Defendants' proposed construction relies on Figures 1, 3, and 5-7 of the specification, which discloses the only detailed description of the particular structure for the encoder in the specification.  As such, this disclosure informs a person of ordinary skill in the art of the limits of the disclosed structure and the equivalents thereof.  Therefore, Defendants' proposed construction should be adopted.

(b)    **"code generating means for . . ."**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Function: generating spreading codes to be allocated to the channels, wherein each of the spreading codes is selected on the basis of a data rate of the data part and the control part and spreading codes are selected so that two consecutive pairs of the I and Q data are correspondent to two points located on the same point or symmetrical with respect to a zero point on a phase domain.<br><br>Structure: Spreading Code Generator shown in FIG 4, as well as in FIGS 3, 5-7 as Spreading Code Generator (121), and defined by 6:6-16 and 6:42-7:36, and equivalents thereof. | Function: generating spreading codes to be allocated to the channels.<br><br>Structure: spreading code generator (121), and equivalents thereof.<br><br>The "wherein…" portion does not need further construction. |

17

1   　　　The parties dispute both the function and structure for the "code generating

2   means for generating spreading codes to be allocated to the channels, wherein each

3   of the spreading codes is selected on the basis of a data rate of the data part and the

4   control part and spreading codes are selected so that two consecutive pairs of the I

5   and Q data are correspondent to two points located on the same point or symmetrical

6   with respect to a zero point on a phase domain."

7   　　　***Identification of the Function.***   The parties again disagree on whether the

8   "wherein" clause is part of the function.   The function properly includes the

9   "wherein" clause for two reasons.   First, the wherein clause further defines what the

10   "code generating means" generates, *i.e.* spreading codes that are selected "on the

11   basis of the data part and the control part" and "so that two consecutive pairs of the I

12   and Q data are correspondent to two points located on the same point or symmetrical

13   with respect to a zero point on a phase domain."   This feature is stressed repeatedly

14   in the patent text.   The text of the wherein clause appears in the Abstract and other

15   passages in the specification either verbatim or essentially verbatim.   *See, e.g.*, '906

16   pat. at Abstract, 2:6-12, 2:23-30, 2:41-48, 2:59-65, 3:8-14.   Moreover, the

17   generation and use of the particular codes described in the wherein clause—that

18   allegedly reduce peak-to-average-power-ratio—is the object of the purported

19   invention.   '906 pat. at Abstract.   Thus, to exclude the "wherein" clause from

20   defining the function is to write out the purported objective of the invention, and to

21   improperly broaden the patent.

22   　　　Second, this "whereby" language was used to distinguish prior art during

23   prosecution.   To overcome the Ovesjo patent, Applicants argued:

24

25   　　　Ovesjo does not disclose or suggest a selection of the
　　　spreading codes such that the two consecutive pairs of

26   　　　the I and Q data are correspondent to two points located
　　　on the same point or symmetrical with respect to a zero

27   　　　point (origin) on a phase domain.   Instead, in Ovesjo the
　　　spreading codes are assigned so that the control channel

28

18

> is orthogonal to all physical channels in the composite spread spectrum signal.

Ex. H, Response to Office Action Mailed July 2, 2003.  Applicants intentionally tied the "wherein" language to the generation of the spreading codes, and argued that the spreading codes must be generated only as described by this clause.  Plaintiff cannot now suggest that this clause does not limit the claim.  The "wherein" clause helps describe the function of this element, so it belongs in the construction of function. *See Lockheed Martin*, 324 F.3d at 1319; *Competitive Technologies*, 286 F.Supp. 2d at 1187-1188; *Intergraph*, 508 F.Supp. 2d at 768-769; *Digital Tech. Licensing, Inc.*, 2007 WL 2300792 at *5.  The patentee cannot rely on this clause to obtain allowance of the patent and ignore them during litigation, as Plaintiff attempts to do here.  Accordingly, the Court should adopt Defendants' proposed function.

   ***Identification of Corresponding Structure.***  Both parties agree that the "spreading code generator" is part of the structure.  Defendants' proposed construction, however, more precisely identifies the structure because the spreading code generator is labeled "spreading code generator (121)" in Figures 3, 5-7 and comprises the entirety of Figure 4.  Defendants' proposed construction relies on the intrinsic evidence of the specification (Figure 4, as well as Figures 3, 5-7 and the text at 6:6-16 and 6:42-7:36), which discloses a particular structure for the spreading code generator, and which is the only detailed description of the spreading code generator in the specification.  As such, this disclosure informs a person of ordinary skill in the art of the limits of the disclosed structure and the equivalents thereof.  Therefore, Defendants' proposed construction should be adopted.

   (c) **"spreading means for . . ."**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| <u>Function</u>: spreading the control channel and the data channels by using the spreading codes to thereby generate the channel-modulated signal. | <u>Function</u>: spreading the control channel and the data channels by using the spreading codes.<br><br><u>Structure</u>: spreader (130), and |

4832-9016-1442.1

| | |
|---|---|
| **Structure**: The combination of Spreader (130), Scrambler (140), Filter (150), Gain Adjuster (160), and Adder (170) in the arrangement shown in Fig. 3 and defined by 6:23-41, and equivalents thereof. | equivalents thereof.<br>The "wherein…" portion does not need further construction. |

The parties differ on the identification of the function, as well as the identification of the corresponding structure for performing the claimed function.

***Identification of the Function.*** Defendants' construction includes the "thereby" clause, which is part of the functionality required by the "spreading means." As discussed above, such clauses are appropriately included when they describe functionality rather than a mere result. *See Lockheed Martin*, 324 F.3d at 1319; *Competitive Techs.*, 286 F.Supp. 2d at 1187-1188; *Intergraph*, 508 F.Supp. 2d at 768-769. Nothing in the claim language indicates that this clause is simply the necessary result of the recited spreading means. The claim language instead describes the function of the spreading means as both spreading the control and data channels by using the spreading codes *and* generating the channel-modulated signal. Notably, the "thereby" clause appears multiple times in the intrinsic evidence cited by both parties ('906 pat. at 2:30-33, 2:48-51, 2:65-67, 3:14-16) for this element. Plaintiff's alternative construction nevertheless attempts to blot it out. The "thereby" clause is part of the function, and thus should be included in the construction, as Defendants propose.

***Identification of Corresponding Structure.*** With respect to the structure, although the spreader 130 spreads the control part and the one or more data parts using spreading codes, a channel-modulated signal is not generated until after the adder 170 sums the gain-adjusted signal. *See,* '906 pat. at 6:39-41 (e.g., "… to thereby generate a channel-modulated signal"). After being spread by the spreader 130, the control part and one or more data parts then pass through the scrambler 140, filter 150 and gain adjuster 160, before reaching the adder 170. Thus, in order

4832-9016-1442.1

1   to perform the entire function, the corresponding structure must include the spreader

2   130, scrambler 140, filter 150, gain adjuster and adder 170.  Defendants'

3   identification of the corresponding structure is supported by the specification of the

4   '906 patent, and should be adopted as the construction that best comports with the

5   language of the claims and the written description.

6                   (d)   **"first spreading code generation means . . ." and**

7                         **"second spreading code generation means . . ."**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Function: generating the spreading code to be allocated to the data channel in response to the count value and the spreading factor. | Function: generating the spreading code to be allocated to the data channel in response to the count value and the spreading factor. |
| Structure: logical operator (231) and in combination with multiplexer (232) as defined by Fig. 4 and 6:59-7:33, and equivalents thereof. | Structure: logical operator (231) and multiplexer (232), and equivalents thereof. |
| Function: generating the spreading code to be allocated to the control channel in response to the count value and the spreading factor. | Function: generating the spreading code to be allocated to the control channel in response to the count value and the spreading factor. |
| Structure: logical operator (233) and in combination with multiplexer (234) as defined by Fig. 4 and 6:66-7:33, and equivalents thereof. | Structure: logical operator (233) and multiplexer (234), and equivalents thereof. |

21          The parties agree that the proposed structure should include the logical

22   operation and a multiplexer, but, again, Defendants' construction provides more

23   specificity by referring to the only portions of the specification that disclose these

24   structures, as required for means-plus-function claims.  Specifically, for the first

25   spreading code generation means, Defendants' proposed construction relies on the

26   intrinsic evidence of the specification at Figure 4 and 6:59-7:33, which discloses a

27   particular structure and the detailed operations of the logical operator 231 and the

28   multiplexer 232.  It is the only detailed description of these elements in the

specification, and informs a person of ordinary skill in the art of the required structure and the equivalents thereof.

For the second spreading code generation means, Defendants' proposed construction similarly relies on the intrinsic evidence of the specification (Figure 4 and 6:66-7:33), which discloses a particular structure and the detailed operations of the logical operator 233 and the multiplexer 234.  Again, it is the only detailed description of these elements in the specification, and informs a person of ordinary skill in the art of the required structure and the equivalents thereof.

(e) **"second logical operation  means . . . for carrying out . . ." and "first logical operating means . . . for carrying out . . ."**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Function: carrying out a logical operation with the spreading factor and the code number related to the control part to thereby generate the spreading code related to the control part in response to the count value.<br><br>Structure: logical operator (233) as defined by Fig. 4 and 6:59-7:29, and equivalents thereof. | Function: carrying out a logical operation with the spreading factor and the code number related to the control part in response to the count value.<br><br>Structure: logical operator (233), and equivalents thereof.<br><br>The "thereby . . ." portion does not need further construction. |
| Function: carrying out a logical operation with the spreading factor and the code number related to the data part, to thereby generate the spreading code related to the data part in response to the count value.<br><br>Structure: logical operator (231) as defined by Fig. 4 and 6:59-7:29, and equivalents thereof. | Function: carrying out a logical operation with the spreading factor and the code number related to the data part in response to the count value.<br><br>Structure: logical operator (231), and equivalents thereof.<br><br>The "thereby . . ." portion does not need further construction. |

The parties differ on the identification of the function, as well as the identification of the corresponding structure for performing the claimed function.

22

4832-9016-1442.1

*Identification of the Function.*   The parties dispute whether it is appropriate to ignore the thereby clauses (1) "to thereby generate the spreading code related to the data part" and (2) "to thereby generate the spreading code related to the control part."   These "thereby" clauses do not recite mere results; they describe how the first and second logical operations means necessarily function.   The "thereby" clauses specify that the two logical operation means' functions include generation of the spreading codes.   Notably, these clauses appear essentially verbatim in the intrinsic evidence citations of both parties.   '906 pat. at 6:59-7:29.   Therefore, the "thereby" clauses define the functionality of the first and second logical operation means and thus belong in the construction of function.   *See Lockheed Martin*, 324 F.3d at 1319; *Competitive Technologies*, 286 F.Supp. 2d at 1187-1188 (N.D. Cal. 2003); *Intergraph*, 508 F.Supp. 2d at 768-769.

*Identification of Corresponding Structure.*   Defendants' proposed construction relies on the intrinsic evidence of the specification (Figure 4 and 6:59-7:29), which discloses details of the operations of the logical operator 231 involving the spreading factor and the code number.   As the only detailed description of these operations in the specification, this disclosure informs a person of ordinary skill in the art of the required structure and the equivalents thereof.   Accordingly, Defendants' proposed construction should be adopted.

(f)   **"second selection means for . . ." and "first selection means for . . ."**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Function: outputting the spreading code related to the control part in response to a select signal as the spreading factor related to the control part. | Function: outputting the spreading code related to the control part in response to a select signal as the spreading factor related to the control part. |
| Structure: multiplexer (234) of Fig. 4, and equivalents thereof. | Structure: multiplexer (234), and equivalents thereof. |
| Function: outputting the spreading code related to the data part in response to a | Function: outputting the spreading code related to the data part in response to a |

23

4832-9016-1442.1

| | |
|---|---|
| select signal as the spreading factor related to the data part. | select signal as the spreading factor related to the data part. |
| <u>Structure</u>: logical operator (232) of Fig. 4, and equivalents thereof. | <u>Structure</u>: multiplexer (232), and equivalents thereof. |

The parties agree on the functions of these terms, and dispute only the specificity of the proposed structures. Defendants' proposed construction again relies on the intrinsic evidence of the specification (Figure 4), which discloses details of the operations of the logical operator 232 involving the spreading factor and the code number. This is the only detailed description of these operations in the specification, and informs a person of ordinary skill in the art of the required structure and the equivalents thereof. Thus, Defendants' construction should be adopted.

(g)   **Dependent Claims 16 and 18**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "16. The apparatus as recited in claim 15, wherein the first logical operation means carriers out a logical operation of $\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$ if the predetermined spreading factor is $2^N$ where N is 2 to 8." | |
| This claim limitation narrows the recited function of a §112 ¶6 claim element. | This claim limitation narrows the recited function of a §112 ¶6 claim element. |
| <u>Function</u>: The function of "carrying out a logical operation with the spreading factor and the code number related to the control part, to thereby generate the spreading code related to the control part in response to the count value" is further limited to "carrying out a logical operation of $\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$ | <u>Function</u>: The function of "carrying out a logical operation with the spreading factor and the code number related to the control part, to thereby generate the spreading code related to the control part in response to the count value" is further limited to "carrying out a logical operation of $\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$ if the predetermined spreading factor is |

24

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

4832-9016-1442.1

| | |
|---|---|
| if the predetermined spreading factor is 2N where N is 2 to 8." <br><br> <u>Structure</u>: logical operator (231) as defined by Fig. 4 and 6:59-7:29, and equivalents thereof. | 2N where N is 2 to 8." <br><br> <u>Structure</u>: logical operator (231), and equivalents thereof. |
| "18. The apparatus as recited in claim 17, wherein the second logical operation means <br><br> $$\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$$ <br><br> carries out a logical operation of _____ if the predetermined spreading factor is $2^N$ where N is 2 to 8." | |
| This claim limitation narrows the recited function of a §112 ¶6 claim element. <br><br> <u>Function</u>: The function of "carrying out a logical operation with the spreading factor and the code number related to the control part, to thereby generate the spreading code related to the control part in response to the count value" is further limited to "carrying out a logical operation of <br><br> $$\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$$ <br><br> if the predetermined spreading factor is 2N where N is 2 to 8." <br><br> <u>Structure</u>: logical operator (233) as defined by Fig. 4 and 6:59-7:29. | This claim limitation narrows the recited function of a §112 ¶6 claim element. <br><br> <u>Function</u>: The function of "carrying out a logical operation with the spreading factor and the code number related to the control part, to thereby generate the spreading code related to the control part in response to the count value" is further limited to "carrying out a logical operation of <br><br> $$\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$$ <br><br> if the predetermined spreading factor is 2N where N is 2 to 8." <br><br> <u>Structure</u>: logical operator (232), and equivalents thereof. |

Dependent claims 16 and 18 recite additional limitations for the "first and second logical operation means." Both parties' constructions acknowledge that these dependent claims further limit the "logical operation means," and the parties agree on the functions of these terms. Defendants' constructions, however, identify the proposed structures with the proper degree of specificity. The cited text discloses details of the operations of the logical operator 231 involving the spreading factor and the code number. The cited text further discloses details of the

25

1   operations of the logical operator 233 involving the spreading factor and the code

2   number.  This is the only detailed description of these operations in the

3   specification, and informs a person of ordinary skill in the art of the required

4   structure and the equivalents thereof.  Therefore, Defendants' constructions for these

5   terms should be adopted.

(h)   **"counting means for consecutively producing a count value in synchronization with a clock signal"**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| This limitation is governed by 35 U.S.C. § 112, ¶ 6. <br><br> <u>Function</u>: "consecutively producing a count value in synchronization with a clock signal." <br><br> <u>Structure</u>: 8-Bit Counter (220) shown in FIG 4, and equivalents thereof. | This is a §112 ¶ 6 claim element. <br><br> <u>Function</u>: consecutively producing a count value in synchronization with a clock signal. <br><br> <u>Structure</u>: counter (220), and equivalents thereof. |

The Court should construe the corresponding structure of the by 35 U.S.C. §

112, ¶ 6 term "counting means for consecutively producing a count value in

synchronization with a clock signal" as the "8-Bit Counter (220) shown in FIG 4,

and equivalents thereof."  All the parties agree that this claim term is governed by

35 U.S.C. § 112, ¶ 6, and all the parties agree to the function of this term.  *See*

Defendants' Patent Local Rule 4-1 Responsive Claim Constructions at 21.  The

parties dispute the identification of corresponding structure.  Defendants identify the

corresponding structure required to perform the function as explained in the

specification, whereas Plaintiff recites a "counter" with an ambiguous reference to

avoid giving a clear direction to a fact finder as to the corresponding structure in the

specification.  Plaintiff's approach is an improper attempt to expand the

corresponding structure beyond what is disclosed by the patent.  Structure disclosed

in the specification is "corresponding structure" when the specification "links or

4832-9016-1442.1

associates that structure to the function recited in the claims." *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1377-78 (Fed. Cir. 2008).

The specification is clear that the only counter used in the alleged invention in the '906 patent is specifically an 8-bit counter.  "Referring to FIG. 4, there is shown a block diagram describing a spreading code generator shown in FIG. 3.  As shown, the spreading code generator includes a storage device 210, ***an 8-bit counter 220***, a plurality of logical operators 231 and 233 and a plurality of multiplexers 232 and 234."  '906 patent at 6:42-46 (emphasis added).  The specification goes on to explain the counter a few lines below:  "The ***8-bit counter 220*** consecutively produces a count value of $B_7B_6B_5B_4B_3B_2B_1B_0$ as 8-bit count value in synchronization with a clock signal CHIP_CLK issued from an external circuit, wherein $B_0$ to $B_7$ are made up of a binary value of 0 or 1, respectively."  *Id.* at 6:54-58 (emphasis added).  Finally, the figure that the '906 patent includes to describe and show the structure of the entire spreading code generator specifically labels the counter as an "8-BIT COUNTER."  *Id.* at Fig. 4.  Figure 4 is shown below with the 8-bit counter highlighted:

27

4832-9016-1442.1





FIG. 4

The specification discloses no other counter for performing this function other than an 8-bit counter. Indeed, the generic term "counter" is never used in the specification without specifying the number of bits – *i.e.*, an "8-bit counter." When only a single embodiment is disclosed as performing a recited function, that embodiment is the sole "corresponding" structure. *See id.*; *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1296 (Fed. Cir. 2012) ("If a patentee chooses to disclose a single embodiment, then any means plus function claim limitation will be limited to the single disclosed structure and equivalents thereof."). The claims must therefore be limited to the structure disclosed in the specification, which is an 8-bit counter.

Because the '906 patent only discloses an 8-bit counter, that is the only appropriate structure for the term "consecutively producing a count value in synchronization with a clock signal," and Plaintiff's attempt to improperly broaden the structure to a generic counter should be rejected.

4832-9016-1442.1

(i)   **"plurality of data channels"**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| more than one data channel | This term does not need further construction. |

The Court should construe the claim term "plurality of data channels" as "more than one data channel."  There can be little real dispute as to the substance of Defendants' proposed construction.  Plaintiff's own claim construction expert, Dr. Vojcic agreed with the definition at his recent deposition in the context of the '906 patent, the parent of the '173 patent:

> Q. So you need to have a plurality of data channels for claim 14, right?
> A. That's correct.
> Q. And plurality in this context just means more than one. Is that fair?
> A. Yeah, that's fair.

Ex. I, February 20, 2015 deposition of Branimir R. Vojcic, PhD at 102:24-103:5. When discussing claim 1 of the '173 patent, Dr. Vojcic agreed the same meaning applies.  Ex. I, Vojcic Dep. at 125:25-126:2 (agreeing in the context of the '173 patent, "the plain and ordinary meaning [of plurality] would be more than one.").

Dictionary definitions are similarly in accord.  *See* The American Heritage Dictionary, 5th Edition https://ahdictionary.com/word/search.html?q=plurality; https://ahdictionary.com/word/search.html?q=plural ("Plurality" means "the state or fact of being plural," and "plural" means "composed of more than one member, set, or kind.").  Despite its own expert's admission, Plaintiff apparently continues to dispute the construction without basis.  However, Plaintiff's only proffered alternative is that "no further construction is necessary."  By disputing Defendants' construction, Plaintiff apparently seeks to preserve some ambiguity in the claim language and impermissibly broaden it beyond its proper meaning.  Accordingly, an express construction is required to delineate the scope of the claims for purposes of invalidity and noninfringement.  *O2 Micro International v. Beyond Innovation Technology Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[w]hen the parties present a

29

fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it").  Defendants' construction helps clearly define what the inventors claimed in claims 1 and 16 and provides a more complete picture of the meaning of "plurality" as it is used in the '173 patent.  By the plain language of the claims, the patentees clearly meant to claim more than one data channel.   The Court should construe "plurality of data channels" as "more than one data channel."

(j)    **"a counter"**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| an 8-bit counter | This term does not need further construction. |

(k)    **"consecutively producing a count value in synchronization with a clock signal"**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| using a clock signal to produce an 8-bit binary count value | This term does not need further construction. Alternatively: Using a clock signal to produce a count value. |

The Court should construe the term "a counter" as "an 8-bit counter," and construe "consecutively producing a count value in synchronization with a clock signal" as "using a clock signal to produce an 8-bit binary count value," and reject Plaintiff's attempt to broaden the meaning of these terms by leaving them unconstrued.

Defendants' constructions are mandated by the claim language itself, where claim construction "begins and ends in all cases." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim.").  In all the claims of the '173 patent, the claim language requires the "counter" to generate a spreading code particular length of bits, here 256 bits.  '173 patent at Claim 1 ("the spreading code

30

allocated to the control channel is represented by $C_{256,\,0}$, where 256 denotes the spreading factor and 0 the code number"); Wicker Decl. at ¶ 132. That is, the counter claimed in the '173 patent must be able to generate a spreading code that is 256 binary digits long. Wicker Decl. at ¶ 132.

This "counter," in turn, must have particular attributes in order to generate a 256 bit length spreading code. There is a direct relationship between the type of counter (*e.g.*, 8-bit, 6-bit, 4-bit, etc.) and the maximum length of a spreading code it can generate. This derives from use binary numbers (zeros and ones) in the counter. When you have less than an 8-bit length counter, there are not enough binary numbers available in the counter to generate a code 256 bits long.



Wicker Decl. at ¶ 133.

As shown above, when you have less than 8 bits, such as 7 bits, you can only count using a binary counter to 128.[4]  Similarly, with 6 bits one can only count to

---

[4] 1 bit= $2^1$=2
2 bits= $2^2$=4
3 bits= $2^3$=8
4 bits= $2^4$=16
5 bits= $2^5$=32
6 bits= $2^6$=64
(footnote continued)

31

4832-9016-1442.1

64.  To generate 256 bits of data (like a 256 bit length spreading code required by the '173 patent's claims) using a binary counter, an 8-bit wide counter must be employed.  The same principle applies when counting using regular numbers (called "base 10" by engineers): If you only have two digits, you can only count to 99.  You need three digits to count to 100.  Likewise, in binary, 8 bits are necessary to count to 256.  Wicker Decl. at ¶ 134.

Faced with these twin requirements of the claim language ((1) a counter; and (2) that counter that generates a code 256 bits in length), a person of ordinary skill understands that a particular counter is required by the claim—one that is 8-bits in length.  Wicker Decl. at ¶ 135.  A person of ordinary skill in the art would understand that a code 256 bits in length would drive the requirement for an 8-bit wide counter.   Accordingly, the claim language itself conveys to one of ordinary skill that the "counter" be 8 bits in length—*i.e.*, an 8-bit counter.

The specification of the '173 patent similarly supports Defendants' constructions.  As discussed above, the specification discloses *only* an 8-bit counter, never any other type of counter.  "Referring to FIG. 4, there is shown a block diagram describing a spreading code generator shown in FIG. 3.  As shown, the spreading code generator includes a storage device 210, ***an 8-bit counter 220***, a plurality of logical operators 231 and 233 and a plurality of multiplexers 232 and 234."  '173 pat. at 6:51-55 (emphasis added).  The specification goes on to explain the counter a few lines below:  "The ***8-bit counter 220*** consecutively ***produces a count value of $B_7B_6B_5B_4B_3B_2B_1B_0$ as 8-bit count value*** in synchronization with a clock signal CHIP_CLK issued from an external circuit, ***wherein $B_0$ to $B_7$ are made up of a binary value of 0 or 1***, respectively."  *Id.* at 6:63-67 (emphasis added).  Finally, the figure of the '173 patent showing the structure of the entire spreading

---

7 bits= $2^7$=128
8 bits= $2^8$=256

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

code generator specifically labels the counter as an "8-BIT COUNTER." *Id.* at Fig. 4.

The '173 patent is silent on any other available counter other than the 8-bit counter disclosed; it is the single mechanism described in the specification. Unlike the means-plus-function context discussed above, Defendants are mindful that simply disclosing a single embodiment does not, by itself, require limiting the claims to a particular counter. Instead, the specification's sole disclosure of an 8-bit counter is consistent with and reinforces the requirement of an 8-bit counter present within the claim language. *See Mformation Tech. v. Research in Motion Ltd.*, 764 F. 3d 1392, 1400 (Fed. Cir. 2014) ("And while it is true that we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment, we do note that our conclusion is consistent with the sole embodiment in the specification." (citations and quotations omitted).)

Plaintiff's claim construction expert, Dr. Vojcic provides no reasonable alternatives to Defendants' constructions. His expert declaration mentions examples of counters with *more* than 8-bits, but he does not dispute that one needs at least an 8-bit counter to create the 256 bit length code required by the claim language:

> Q. So you're not -- you're not putting forth the expert opinion sitting here today that you could create a code with a length of 256 bits using a less than eight bit counter. Is that fair?
> A. No, no, that's fair. I just gave examples for longer.

Ex. I, February 20, 2015 Deposition of Branimir R. Vojcic, Ph.D. at 137:16-21.

To a person of ordinary skill in the art, the claim language, when viewed in light of the only embodiment disclosed in the specification, is clear: the "counter" of the '173 patent is an 8-bit counter.

(l) **"a channel coding unit that encodes the source data to generate a plurality of data parts and a control part, wherein the data parts are allocated to the data**

33

**channels and the control part is allocated to the control channel"**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| This limitation is governed by 35 U.S.C. §112, ¶6. | This limitation is not governed by 35 U.S.C. §112, ¶6. |
| <u>Function</u>: "encodes the source data to generate a plurality of data parts and a control part, wherein the data parts are allocated to the data channels and the control part is allocated to the control channel" | Should this term be construed under 35 U.S.C. § 112, ¶ 6, SPH proposes the following: |
| | <u>Function</u>: encodes the source data to generate a plurality of data parts and a control part. |
| <u>Structure</u>: Encoder (110) shown in Figs. 1, 3, 5-7, and equivalents thereof. | <u>Structure</u>: encoder (110), and equivalents thereof. |
| | The "wherein…" portion does not need further construction. |

This term, found in claim 1 of the '173 patent, presents three issues: (1) whether the term overcomes the presumption that § 112, ¶ 6 does not apply, (2) whether the language after the "wherein" clause is necessarily part of the "function" if § 112, ¶ 6 applies, and (3) whether the corresponding structure in the specification needs to be cited with the proper specificity if § 112, ¶ 6 applies. Issues (2) and (3) are generally the same as those briefed above with respect to the means-plus-function terms in the '906 patent. The crux of issue (1) is whether substituting "channel coding means" with "channel coding unit" from the '906 patent to the '173 patent permits Plaintiff to circumvent § 112, ¶ 6 in the '173 patent.

A two-step process is used to construe a claim term under § 112, ¶ 6. *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1097 (Fed. Cir. 2014). First, the court determines if the claim term is drafted in the means-plus-function format so as to invoke § 112, ¶ 6. *Id.* Second, if the claim term invokes § 112, ¶ 6, the term is construed by identifying the "the corresponding structure, material, or acts described in the specification." *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1097 (Fed. Cir. 2008).

Here, the heart of the dispute relates the first step – whether the term "channel coding unit . . ." is drafted in the means-plus-function format.  While the failure to use "means" creates a rebuttable presumption that § 112, ¶ 6 does not apply, this presumption can rebutted when a claim term "fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  *Robert Bosch* at 769 F.3d 1097 (citation omitted).

A claim term fails to recite sufficiently definite structure if the claim merely recites a generic nonce word and the remaining claim language, specification, prosecution history, and relevant external evidence provide no further structural description to a person of ordinary skill in the art.  *Mass. Inst. Of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006).  The Federal Circuit, for example, has referred to terms such as "mechanism," "member," "element," and "device" as terms that can invoke § 112, ¶ 6.  *Id.* ("colorant selection mechanism" was a means-plus-function term); *see also Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1214-16 (Fed. Cir. 1998) (presumption against § 112, ¶ 6 rebutted where claim recited "element" and "member" and patent provided no further structural description of these generic terms); *Welker Bearing*, 550 F.3d at 1096-97 (presumption against § 112, ¶ 6 rebutted where claim recited a "mechanism" without further structure described in specification).  Accordingly, if a claim recites a generic term that lacks sufficiently definite structure to a person of ordinary skill in the art when properly construed in light of the specification, the presumption is overcome and the patentee has invoked means-plus-function claiming.

A "channel coding unit" is a generic nonce term that lacks sufficiently definite structure to a person of ordinary skill in the art.  Wicker Decl. at ¶¶123-26.  A named inventor of the '173 patent confirmed that "channel coding unit" was not a term he used in the late 1990's.

> "Channel coding unit," that's a patent term, that's not a term that you used as an engineer in the late 1990s at ETRI; correct?
> MR. MIRZAIE:  Same objections.

35

THE DEPONENT:  For each engineers, they -- the way they expressed was different based on their own understanding.  As for myself I did not use -- to my recollection I did not use such expression.

Ex. K, Jae-Ryong Shim Deposition Transcript, p. 70, l. 2-10.  Moreover, the specification of the '173 patent does not, and cannot, shed light on the meaning of "channel coding unit" as that term is entirely absent from the specification.  Wicker Decl. at ¶125.  The claim term fares worse here than in *MIT* where the Federal Circuit relied the patentee's use of the terms "mechanism" and "means" interchangeably in the specification as evidence to construe "mechanism" as a means-plus-function term because the specification of the '173 patent only uses "channel coding means" and never uses "channel coding unit."

Not only does the term "a channel coding unit that encodes" lack sufficiently definite structure, that term also recites function without reciting sufficient structure for performing that function.  Indeed, Plaintiff's expert, Dr. Vojcic, admits that a "channel coding unit" is merely something that performs channel coding.

Q.  So [a channel coding means or a channel coding unit is] something that performs channel coding.  Is that fair?
A.  That's correct.

Ex. I, Vojcic Deposition Transcript, p. 127, l. 5-7.  A claim term that can be anything that performs the function is the epitome of functional claiming.

In his Supplemental Declaration, Dr. Vojcic's does not cite a single reference to a "channel coding unit" in the specification of the '173 patent and merely relies on the description of encoder 110.  Dkt. 78-1, ¶6.  This analysis, however, conflates step one and step two of the two-step process for construing  a claim term under § 112, ¶ 6.  Defendants do not allege that the term "channel coding unit" lacks ***corresponding*** structure (step two); Defendants allege that that term lacks ***sufficiently definite*** structure (step one).  Accordingly, Dr. Vojcic's citations to encoder 110 are inapposite.  While Defendants propose that the ***corresponding*** structure should be encoder (110) shown in FIGS. 1, 3, 5-7, and equivalents thereof,

1   such proposal does not cure the lack of **sufficiently definite** structure for the term

2   "channel coding unit."

3        Notably, Dr. Vojcic cites no evidence showing that "channel coding unit" was

4   a term known to a person skilled in the art at the time of the alleged effective filing

5   date.

6        Thus, the term "channel coding unit" is a means-plus-function term and the

7   corresponding structure should be encoder (110) shown in Figures 1, 3, 5-7, and

8   equivalents thereof.

9            (m)   **"a second selector that outputs the spreading code to**

10                      **be allocated to the control channel in response to a**

11                      **second select signal"**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| This limitation is governed by 35 U.S.C. §112, ¶6.<br><br>Function: "outputs the spreading code to be allocated to the control channel in response to a second select signal"<br><br>Structure: multiplexer (234) of Fig. 4, and equivalents thereof. | This limitation is not governed by 35 U.S.C. §112, ¶6.<br><br>Should this term be construed under 35 U.S.C. § 112, ¶ 6, SPH proposes the following:<br><br>Function: outputs the spreading code to be allocated to the control channel in response to a second select signal.<br><br>Structure: multiplexer (234), and equivalents thereof. |

21       This term appears in claim 5 of the '173 patent.  The disagreement between

22  the parties presents two issues: (1) does this term overcome the presumption that §

23  112, ¶ 6 does not apply, and (2) are specific citations to the corresponding structure

24  in the specification necessary if § 112, ¶ 6 applies.

25       As was the case with the "channel coding unit" term, § 112(6) applies even

26  though the claim does not use the term "means."  Similarly, the patentee substituted

27  "selection means" with "selector" between the '906 and '173 patents; "selector"

28  lacks sufficiently definite structure as the term is completely missing from the

4832-9016-1442.1

1  specification and was not generally known in the art (Wicker Decl. at ¶¶127-31);

2  and the claim language is purely functional.

3      Accordingly, the term "selector" is a means-plus-function term and the

4  corresponding structure should be multiplexer (234) of Fig. 4, and equivalents

5  thereof.  Defendants' construction is correct and should be adopted.

6  **C.   The '253/'530/'591 Patents**

7      **1.   '253/'530/'591 Patents Background**

8      The '253/'530/'591 patents relate to a technology that controls signaling on a

9  "random access channel" ("RACH").  The RACH is a reverse channel (*i.e.*, from a

10  terminal to a base station) used by a terminal (or "mobile station") to request a

11  transmission channel when it needs to make a call.  All of the terminals requesting a

12  channel from the same base station share the same RACH.  Multiple terminals may

13  try to communicate with the base station at the same time.  In order to process these

14  communications, the base station needs to distinguish between different

15  transmissions and grant permission for certain transmissions to go forward.  When a

16  terminal desires to make a call, it transmits on the RACH to alert the base station.

17  The transmission from the terminal is sent at successively higher power levels until

18  it is acknowledged by the base station.  This is analogous to speaking a message and

19  then repeating it in a louder voice until it becomes apparent that the speaker has

20  been acknowledged by the intended listener.

21      The '253/'530/'591 patents purportedly improve upon many known random

22  access schemes, such as ALOHA, slotted ALOHA, and the random access probes

23  used in ALOHA employing CDMA.  *See,* '253 pat. at 1:26-3:10.  In the prior art, a

24  random access probe sent over the RACH consisted of a preamble to establish

25  synchronization between the codes of the terminal and the base station and an access

26  channel message capsule containing the access information or user's data.  *Id.* at

27  2:28-34; 2:40-47.  The '253 patent allegedly "prevent[s] terminals from

28  unnecessarily transmitting data, thereby avoiding interference signals generated in

1 the reverse common channel," (*id.* at 3:13-20), allows terminals to "quickly

2 retransmit data," (*id.* at 3:21-25), and "enable[s] the base station to broadcast the

3 information concerning the state of the channel card to all terminals" to avoid

4 unnecessary transmissions.  *Id.* at 3:33-37.  The length of data transmission unit is

5 critical to achieve these benefits: "Since the preamble and data constitute a

6 transmission data unit, the performance depends on the power and length of the

7 preamble.  Hence, if the transmission data unit is greater than twice the time slot, the

8 inventive effect is achieved, or otherwise the inventive effect is not obtained."  *Id.* at

9 10:11-18.

10   According to the '253/'530/'591 patents, each terminal includes a data

11 generator 111 that generates a data packet, consisting of a preamble and substantial

12 user data, used to connect the terminal with the base station.  *Id.* at 6:20-23; Fig. 4A.

13 The base station receives this data packet and performs a code synchronization on

14 the preamble of the packet.  *Id.* at 6:31-35; 7:41-44.  After code synchronization

15 occurs, the base station broadcasts a signal to all of the terminals indicating the real

16 time state information for the channel card.  *Id.* at 5:39-43; 6:50-54; 8:53-55; Fig.

17 4A.  Each terminal then determines whether the broadcast information shows that

18 the code synchronization occurred for a data transmission that began in the time slot

19 in which that particular terminal began transmitting.  *Id.* at 7:5-8; 7:44-50; Fig. 4A.

20 If the code synchronization occurred for the data packet sent in the time slot used by

21 that terminal, then the terminal will continue transmitting the remaining portion of

22 the data packet.  *Id.* at 7:8-15; Fig. 4A.  If not, the terminal will stop transmitting the

23 remaining portion of the packet.  *Id.* at 7:15-18; Fig. 4A.

24    **2.**  **Construction of the Disputed Terms**

25     (a)  **"broadcast[ed]" / "broadcast signal"**[5]

26

27    [5]  These terms are present within the '253 patent, claims 34-36, 48, 51, 52, and

28 54; the '530 patent, all asserted claims (i.e., claims 214, 216* , 218*, 222, 256, 259*,
   (footnote continued)

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| transmitted to all terminals within a particular cell / transmission containing information intended for all terminals within a particular cell | These terms do not need further construction.<br><br>Alternatively:<br><br>transmitted to a number of devices within a particular cell / transmission containing information intended for a number of devices within a particular cell |

The parties' dispute regarding the group of claim terms involving "broadcast" centers around whether "broadcast signal" is a transmission containing information intended for "all" terminals or "a number of" terminals.  All the relevant intrinsic and extrinsic evidence – namely, the specification, the figures, the inventor's testimony, dictionary definitions, and the ordinary and customary meaning of the word "broadcast" – support Defendants' proposed construction.

The portions of the '253 patents' specification that discuss the terms "broadcast" or "broadcast signal" explicitly refer to transmitting the signal to "all" terminals, as opposed to "a number of" terminals.  Wicker Decl. at ¶ 160.  For example:

> It is further another object of the present invention to enable the base station to broadcast the information concerning the state of the channel card to *all* terminals in real time so as to prevent the terminals from unnecessarily transmitting data.  '253 patent, 3:33-37 (emphasis added).

> Hence, the effect of broadcasting thus determined broadcast signal to *all* terminals prevents the interference signals because the other terminals are stopped to transmit

_____

263, 279*, 283, 284, and 290); and '591 patent, all asserted claims (i.e., claims 55, 61, 62, 63*, 64, 79, 85*, 87*, and 88).  An asterisk (*) indicates that a claim is not expressly asserted by Plaintiff, but is part of a dependent claim that is asserted.

data when the code synchronization has been attained.  *Id.* at 6:46-49; 9:42-45 (emphasis added).

Therefore, as shown in FIG. 4A, the detection of the data transmitted at the beginning of the first time slot S0 is recognized by the base station [200] at the beginning of the third time slot S2, transmitted to ***all*** the terminals.  *Id.* at 7:41-44; 10:36-39 (emphasis added).

Thus, the base station broadcasts a signal representing the detection of the synchronization of the data transmitted through the reverse common channel to ***all*** terminals to selectively stop unnecessary data transmission, preventing the reverse common channel from being affected by the unnecessary signal interference.  *Id*. at 11:45-50 (emphasis added); *see* similar passages in the specifications of the '530 and '591 patents; Wicker Decl. at ¶ 160.

Contrary to the testimony of Plaintiff's expert, Dr. Vojcic (*see* Dkt. 78-1, ¶ 13), nowhere in the specification is "broadcast signal" described as being transmitted only to a subset of terminals.  Wicker Decl. at ¶ 161.  Indeed, even portions of the specification Dr. Vojcic cites in support of the plaintiff's proposed construction instead support Defendants' construction—that a "broadcast signal" is transmitted to "all" terminals.  Dkt. 78-1, ¶ 13; '253 patent, 6:46-49; *id.* at 10:36-39; *id.* at 11:45-50; Wicker Decl. at ¶ 160.  Dr. Vojcic admits in his original declaration that "[o]nce the base station has detected the preamble, it ***broadcasts a preamble acquisition signal to all handsets***, indicating that one or more preambles have been detected."  Decl. of Dr. Branimir R. Vojcic, Dkt 55-7, ¶ 48 (emphasis added).

Defendants' proposed constructions are consistent with the patent specification's description of "broadcast signals."  Wicker Decl. at ¶ 162.  For example, in Fig. 4B of the '253 patent, five data packets stop transmitting after receiving the broadcast signal from the base station at time $S_{2-1}$, while the remaining two data packets for which the terminals determined that the base station acquired synchronization with the terminals continue to transmit.  *Id.*  That is, ***all*** the

41

4832-9016-1442.1

terminals in Figure 4B receive and react to the broadcast signal, illustrating that the "broadcast signals" are transmitted to *all* terminals within the particular cell.  *Id.*

The inventor's testimony also supports Defendants' proposed construction. The first-named inventor of the RACH patents – Tae-Joong Kim – testified that "[t]he base station broadcast [sic] that information to *all* the terminals [] ***within the boundary of the base station***" and that "the channel card information of the base station of – for each of the slots will be sent to *all* terminals in real time.  And based upon that, I explained to you that I believe that this would be ***one major part of the invention***."  Ex. J, Kim Transcript, p. 81, l. 25 to p. 82, l. 4; p. 31, ll. 4-24 (emphasis added).

Dr. Kim's testimony further clarifies that the term "broadcast" means that the signal is transmitted to all terminals, regardless of whether the transmitted signal is actually received by all terminals (i.e., whether the transmitted signal impinged on the antenna of every terminal).  "[W]hen it says that it is broadcast 'to all terminals,' what that means is that it is sent using the code that is recognized by the terminals -- *all* terminals.  And ***whether the terminal will receive the signal or not***, that would be determined by the terminal itself depending on its need.  So, for example, a paging channel is broadcast, but although it is something that is broadcast, it doesn't mean that all terminals would receive those."  *Id.* at p. 147, l. 18 to p. 148 l. 3 (emphasis added).  Regarding one of the '253 patent figures, Dr. Kim further testified that "Figure 4A shows the base station is sending to *all* terminals, ***whether a packet transmitted is received or not***."  *Id.* at p. 81, ll. 14-19 (emphasis added).

The inventor's admissions reveal that the Defendants' construction captures "a major part of the invention."  This fact has significant legal consequences:  a patentee cannot use a broad construction to claim more than its inventors contemplated and which simultaneously renders its invention inoperable.  *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole,

4832-9016-1442.1

1   this description limits the scope of the invention"); *Talbert Fuel Sys. Patents Co. v.*

2   *Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir.) ("[A] construction that renders the

3   claimed invention inoperable should be viewed with extreme skepticism"), *vacated*

4   *and remanded on other grounds*, 537 U.S. 802 (2002).  Plaintiff is attempting to

5   obtain a construction that ignores a "major part of the invention" in order to expand

6   the scope of the claims, and in so doing, it ignores the fact that if the "broadcast

7   signal" of the claimed invention were not received by **all** handsets within a

8   particular cell, the claimed invention would not work because the mobiles that did

9   not receive the "broadcast signal" would transmit over one another causing

10  interference.

11          Furthermore, one of ordinary skill in the art would have understood the term

12  "broadcast signal" to mean transmission of information that contains universal

13  content intended for all terminals in a particular cell.  Wicker Decl. at ¶ 165.  Dr.

14  Vojcic's reading of the term "broadcast signal"—that the transmission contains

15  information "unique to the detected preamble"—contradicts the common and

16  ordinary meaning of the term as one of ordinary skill in the art at the time would

17  have understood.  Ex. I, Vojcic Depo. at 182:3-4.

18          Moreover, one of ordinary skill in the art would have understood that the term

19  "broadcast" is distinguishable from the terms multicast or unicast.  Wicker Decl. at ¶

20  166.  The term multicast describes a transmission targeted at several terminals, but

21  not all terminals, within a particular cell.  *Id.*  Unlike a broadcast signal, a multicast

22  signal is transmitted to any number of terminals.  Wicker Decl. at ¶ 166.  The term

23  unicast describes a transmission targeted at a single terminal, *i.e.*, a specified

24  destination.  *Id.*  SPH's own expert admits that SPH's construction is wrong to the

25  extent that "any number of terminals" covers a single terminal.  *See* Ex. I, Vojcic

26  Depo. at 184:6-185:8 ("[A] unicast signal [is] different from a broadcast signal [i]n

27  that it is specifically intended only for . . . a single recipient.").  Thus, SPH's

28  constructions of the terms "broadcast[ed]" and "broadcast signal" contradict the

1  meaning of those terms as would have been understood by one of ordinary skill in
2  the art.  The Court should reject SPH's attempt to expand the scope of the term
3  "broadcast" to include multicast and unicast.

4      Dictionaries used by one of ordinary skill in the art around the time of the
5  alleged invention support Defendants' proposed construction.  Wicker Decl. at ¶
6  163.  In particular, the IEEE Standard Dictionary of Electrical and Electronics
7  Terms (1993, 5th ed.), which was widely used by artisans in the field of
8  telecommunications, defines the term "broadcast transmission" as "a transmission
9  addressed to *all* stations."  Ex. L, DEF_SPH_00015382 (emphasis added); Wicker
10  Decl. at ¶ 163.  It also defines "broadcast message" as "a sequence of one or more
11  data transfers from the bus owner to *all* replying agents, with uninterrupted bus
12  ownership."  *Id.* (emphasis added).  Similarly, Newton's Telecom Dictionary (1993,
13  6th ed.) defines "broadcast message" as "a message from one user sent to *all* users."
14  Ex. M, DEF_SPH_00015387 (emphasis added) ; Wicker Decl. at ¶ 163.

15      In view of the intrinsic evidence and the extrinsic evidence – including the
16  inventor's own admission that the transmission of the "broadcast signal" to *all*
17  handsets is a "major part of the invention" – the Defendants' proposed construction
18  for these terms should be adopted by the Court.

19  **VI.   CONCLUSION**

20      For the foregoing reasons, Defendants respectfully request that the Court
21  adopt Defendants' proposed constructions.

22

23

24

25

26

27

28

4832-9016-1442.1

1  Dated:  March 20, 2015                    Respectfully submitted,

2                                            **FOLEY & LARDNER LLP**

3
                                            By:   */s/ Jose L. Patiño*
4
                                            Jose L. Patiño, CA Bar No. 149568
5                                            Nicola A. Pisano, CA Bar No. 151282
                                            Christopher C. Bolten, CA Bar No. 268284
6

7                                            *Attorneys for Defendants and Counter-*
                                            *Plaintiffs HUAWEI TECHNOLOGIES CO.,*
8                                            *LTD., FUTUREWEI TECHNOLOGIES, INC.*
9                                            *AND HUAWEI DEVICE USA, INC.*

10                                           **PILLSBURY WINTHROP SHAW**
11                                           **PITTMAN LLP**

12                                           By:   */s/ Nicole S. Cunningham*
13                                           Nicole S, Cunningham CA Bar No. 234390
                                            Callie A. Bjurstrom CA Bar No. 137816
14                                           Steven A. Moore CA Bar No. 232114
15                                           Inge Larish CA Bar No. 276720
                                            Richard W. Thill CA Bar No. 236409
16

17                                           *Attorneys for Defendant and CounterPlaintiff*
18                                           *ZTE (USA) INC.*

19                                           **QUINN EMANUEL URQUHART**
20                                           **& SULLIVAN LLP**

21                                           By:  */s/ Kevin P.B. Johnson*
                                            Kevin P.B. Johnson (Bar No. 177129)
22                                           QUINN EMANUEL URQUHART &
23                                           SULLIVAN, LLP
                                            555 Twin Dolphin Drive, 5th Floor
24                                           Redwood Shores, CA 94065
25                                           Tel: 650-801-5000
                                            Fax: 650-801-5100
26

27                                           *Attorneys for Defendant BlackBerry Limited*
                                            *f/k/a Research In Motion Limited*
28

4832-9016-1442.1

**MAYER BROWN LLP**


By: */s/ Dale Giali*

Dale Giali
*dgiali@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone:  (213) 229-9500
Facsimile:  (213) 625-0248

Amr O. Aly (*pro hac vice*)
*aaly@mayerbrown.com*
mailto:1675 Broadway
New York, NY 10019
Telephone:  (212) 506-2304
Facsimile:  (212) 775-8818

Stephen E. Baskin (*pro* hac vice)
*sbaskin@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone  (202) 263-3000
Facsimile: (202) 263-3300

Edward D. Johnson (SBN 189475)
*wjohnson@mayerbrown.com*
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone (650) 331-2000
Facsimile: (650) 331-2060

*Attorneys for Defendant*
*AT&T MOBILITY LLC*

46

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ALSTON & BIRD LLP**

By: */s/ Michael J. Newton*
Michael J. Newton (CA SBN 156225)
ALSTON & BIRD LLP
2828 N. Harwood St., Suite 1800
Dallas, TX 75201
Tel.:  214-922-3400; Fax:  214-922-3899
mike.newton@alston.com

Ross R. Barton (pro hac vice)
ALSTON & BIRD LLP
101 S. Tryon Street, Suite 4000
Charlotte, NC  28280
Telephone (704) 444-1000
Facsimile (214) 444-1677
ross.barton@alston.com

*Attorneys for Defendants T-Mobile US, Inc.*
*and Cellco Partnership d/b/a Verizon*
*Wireless*

47

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and forgoing document has been served on March 20, 2015 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any counsel of record who have not consented to electronic service through the Court's CM/ECF system will be served by electronic mail, first class mail, facsimile and/or overnight delivery.

**MAYER BROWN LLP**

By: */s/ Dale Giali*

Dale Giali
*dgiali@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone:  (213) 229-9500
Facsimile:  (213) 625-0248

48

4832-9016-1442.1