Dale Giali
dgiali@mayerbrown.com
MAYER BROWN LLP
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone:   (213) 229-9500
Facsimile:    (213) 625-0248

*Attorney for Defendant*
*AT&T MOBILITY LLC*

**Appearances of Counsel for each**
**Party are on Next Page and on Signature Page**

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPH AMERICA, LLC <br><br>          Plaintiff, <br>     v. <br><br> AT&T MOBILITY LLC, <br><br>     Defendant. | KSC Case No. 3:13-cv-2318-CAB-KSC <br><br> **DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF** <br><br> Date: May 6 – May 8, 2015 <br> Place: 221 West Broadway, Courtroom 4C |
| SPH AMERICA, LLC <br><br>          Plaintiff, <br>     v. <br><br> HUAWEI TECHNOLOGIES CO., LTD., et al. <br><br>     Defendants. | Case No. 13-CV-2323-CAB- |

SPH AMERICA, LLC

        Plaintiff,

      v.

RESEARCH IN MOTION, LTD, D/B/A BLACKBERRY LIMITED

        Defendant.

Case No. 3:13-cv-2320-CAB-KSC

SPH AMERICA, LLC

        Plaintiff,

      v.

T-MOBILE US, INC.,

        Defendant.

Case No. 3:13-cv-2324-CAB-KSC

SPH AMERICA, LLC

        Plaintiff,

      v.

CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,

        Defendant.

Case No. 3:13-cv-2325-CAB-KSC

SPH AMERICA, LLC,

        Plaintiff,

      v.

ZTE CORP., ET AL.,

        Defendants.

Case No. 3:13-cv-2326-CAB-KSC

1  Heather Belville (Bar No. 262328)
2  heatherbelville@quinnemanuel.com
   QUINN EMANUEL URQUHART & SULLIVAN, LLP
3  865 S. Figueroa St., 10th Floor
   Los Angeles, California 90017
4  Telephone:  (213) 443-3000
5  Facsimile:   (213) 443-3100

6
   Eric Huang (admitted *pro hac vice*)
7  erichuang@quinnemanuel.com
8  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   51 Madison Avenue, 22nd Floor
9  New York, NY 10010
   Telephone: 212-849-7000
10 Facsimile: 212-849-7100

11
12 Jordan R. Jaffe (Bar No. 254886)
   jordanjaffe@quinnemanuel.com
13 QUINN EMANUEL URQUHART & SULLIVAN, LLP
14 50 California Street, 22nd Floor
   San Francisco, CA 94111
15 Telephone: 415-875-6600
16 Facsimile: 415-875-6700

17 *Attorneys for Defendant BLACKBERRY LIMITED*
18 *F/K/A RESEARCH IN MOTION LIMITED*

19
20 Callie Bjurstrom (CA SBN 137816)
   callie.bjurstrom@pillsburylaw.com
21 Steven A. Moore (CA SBN 232114)
22 steve.moore@pillsburylaw.com
   Inge Larish (CA SBN 276720)
23 inge.larish@pillsburylaw.com
   Nicole S. Cunningham (CA SBN 234390)
24 nicole.cunningham@pillsburylaw.com
   Richard Thill (CA SBN 236409)
25 richard.thill@pillsburylaw.com
26 PILLSBURY WINTHROP SHAW PITTMAN LLP
   501 West Broadway, Suite 1100
27 San Diego, CA 92101-3575
   Telephone:  619-544-5000; Facsimile:  619-819-4418
28

Attorneys for Defendant and Counter-Plaintiff
ZTE(USA) INC.


JOSE L. PATIÑO, CA Bar No. 149568
    jpatino@foley.com
NICOLA A. PISANO, CA Bar No. 151282
    npisano@foley.com
CHRISTOPHER C. BOLTEN, CA Bar No. 268284
    cbolten@foley.com
FOLEY & LARDNER LLP
3579 VALLEY CENTRE DRIVE, SUITE 300
SAN DIEGO, CA 92130
TELEPHONE:    858.847.6700
FACSIMILE:    858.792.6773

Attorneys for Defendants and Counter-Plaintiffs
HUAWEI TECHNOLOGIES CO., LTD.,
FUTUREWEI TECHNOLOGIES, INC.
and HUAWEI DEVICE USA, INC.


Dale Giali
dgiali@mayerbrown.com
MAYER BROWN LLP
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone:  (213) 229-9500
Facsimile:   (213) 625-0248

Amr O. Aly (*pro hac vice*)
MAYER BROWN LLP
aaly@mayerbrown.com
1675 Broadway
New York, NY 10019
Telephone:  (212) 506-2304
Facsimile:  (212) 775-8818

Stephen E. Baskin (*pro* hac *vice*)
MAYER BROWN LLP
sbaskin@mayerbrown.com
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone:  (202) 263-3000
Facsimile:  (202) 263-3300

Edward D. Johnson (SBN 189475)
MAYER BROWN LLP

wjohnson@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

*Attorney for Defendant*
*AT&T MOBILITY LLC*

Michael J. Newton (CA SBN 156225)
mike.newton@alston.com
ALSTON & BIRD LLP
2828 N. Harwood St., Suite 1800
Dallas, TX 7520
Telephone: 214-922-3400
Facsimile: 214-922-3899


Ross R. Barton (*pro hac vice*)
ross.barton@alston.com
ALSTON & BIRD LLP
101 S. Tryon St., Suite 4000
Charlotte, NC 28280
Telephone: 704-444-1000
Facsimile: 704-444-1677

*Attorneys for Defendants T-Mobile US, Inc.*
*and Cellco Partnership d/b/a Verizon Wireless*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................... 1

II.  CONSTRUCTION OF DISPUTED CLAIM TERMS ..................................... 2

    A.  The '029 Patent .............................................................................. 2

        1.  "dual-channel QPSK modulator/modulating" ............................. 2

            (a)  Plaintiff Unambiguously Distinguished the Entirety of Gilhousen as a "Balanced" QPSK Modulator .............. 3

            (b)  Plaintiff's Construction Is a Bald Attempt to Maintain Its Improper Infringement Read Across Its Different Asserted Patents .................................... 5

            (c)  Defendants' Construction Is Consistent with the '029 Patent Specification and the Preferred Embodiment ......................................................... 7

            (d)  At Best, Plaintiff's Construction Is Ambiguous ............... 8

    B.  The '906/'173 Patents ........................................................ 10

        1.  "channel coding means for . . ." .................................. 11

        2.  "code generating means for . . ." ................................ 13

        3.  "spreading means for . . ." ......................................... 15

        4.  "first spreading code generation means . . ." and "second spreading code generation means . . ." ..................... 17

        5.  "second logical operation  means . . . for carrying out . . ." and "first logical operating means . . . for carrying out . . ." ..... 18

        6.  "second selection means for . . ." and "first selection means for . . ." ............................................... 20

        7.  Dependent Claims 16 and 18 .................................... 21

i

8.   "counting means for consecutively producing a count value in synchronization with a clock signal"..........................22

9.   "plurality of data channels".........................................24

10.  "a counter".................................................................25

11.  "consecutively producing a count value in synchronization with a clock signal" ......................................................25

12.  "a channel coding unit that encodes the source data to generate a plurality of data parts and a control part, wherein the data parts are allocated to the data channels and the control part is allocated to the control channel"...........28

13.  "a second selector that outputs the spreading code to be allocated to the control channel in response to a second select signal" .................................................................28

C.   The '253/'530/'591 Patents.................................................31

1.   "broadcast[ed]" / "broadcast signal" .........................31

(a)   The Court, Not the Jury, Must Construe This Term ........32

(b)   Plaintiff's Construction Eviscerates a "Major Part of the Invention" and Renders the Claims Inoperable..........33

(c)   Plaintiff's Construction Incorrectly Covers Transmission to Only One Device in a Cell....................36

III.   CONCLUSION ...............................................37

## TABLE OF AUTHORITIES

Page

### Cases

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir.2003) ......................................................... 27

*Acromed Corp. v. Sofamor Danek Group, Inc.*,
253 F.3d 1371 (Fed. Cir. 2001) ................................................... 23, 24

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ................................................... 29, 31

*Biomedino, LLC v. Waters Technology Corp.*,
490 F.3d 946 (Fed. Cir. 2007) ......................................................... 10

*Budde v. Harley-Davidson, Inc.*,
250 F.3d 1369 (Fed. Cir. 2001) ......................................................... 12

*Competitive Technologies*,
286 F. Supp. 2d at 1187-1188 (N.D. Cal. 2003) ................................. 19

*Convolve, Inc. v. Dell, Inc.*,
2011 WL 31792 (E.D. Texas 2011) .................................................. 16

*Intergraph Hardware Technologies Co. v. Toshiba Corp.*,
508 F. Supp. 2d 752 (N.D. Cal. 2007).......................................... 16, 19

*Inventio AG v. Thyssenkrupp Elevator Ams. Corp.*,
649 F.3d 1350 (Fed. Cir. 2011) ......................................................... 31

*JVW Enterprises, Inc. v. Interact Accessories*,
424 F.3d 1324 (Fed. Cir. 2005) ......................................................... 26

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
382 F.3d 1354 (Fed. Cir. 2004) ......................................................... 31

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
324 F.3d 1308 (Fed. Cir. 2003) .............................................. 15, 16, 19

*Mass. Inst. Of Tech. v. Abacus Software*,
462 F.3d 1344 (Fed. Cir. 2006) ......................................................... 30

*O2 Micro Int'l Ltd. v. Beyond Innovation Technology Co., Ltd., et. al.*,
521 F.3d 1351 (Fed. Cir. 2008) .............................................. 10, 23, 32

*Pause Technology LLC v. TiVo Inc.*,
419 F.3d 1326 (Fed. Cir. 2005) ......................................................... 27

*Robert Bosch, LLC v. Snap-On Inc.*,
769 F.3d 1094 (Fed. Cir. 2014) ......................................................... 29

*SPH America, LLC v. Acer, Inc. et al.*,
Case No. 09CV2535-JAH ......................................................... 6, 7, 8, 15

iii

*Southwall Tech., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ................................................................. 12, 14

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001) ..................................................................... 30

*Welker Bearing Co. v. PHD, Inc.*,
   550 F.3d 1090 (Fed. Cir. 2008) ..................................................................... 29

### **Statutes**

35 U.S.C. § 112 .................................................................. 22, 28, 29, 30, 31

## TABLE OF ABBREVIATIONS

**'029 pat.** – U.S. Patent No. 5,960,029.

**'906 pat.** – U.S. Patent No. 7,443,906

**'173 pat.** – U.S. Patent No. 8,121,173 (a continuation of the '906 patent)

**RACH pats.** – U.S. Reissue Patent Nos. 40,253, 44,530, and 44,591

**CDMA** – Code Division Multiple Access

**ETRI** – Electronics Telecommunications Research Institute of Korea

**PN code** – pseudonoise code or pseudorandom noise code

**PTO** – United States Patent and Trademark Office

**QPSK** – Quaternary (or Quadrature) Phase Shift Keying

**RACH –** random access channel

**SPH** – Plaintiff, SPH America, LLC

**Plaintiff** – Plaintiff, SPH America, LLC

**Defendants** – Huawei Technologies Co., Ltd., Huawei Device USA, Inc., Futurewei Technologies, Inc., BlackBerry Limited, ZTE (USA) Inc., AT&T Mobility LLC, T-Mobile US, Inc., and Cellco Partnership d/b/a Verizon Wireless

# I.    INTRODUCTION

Pursuant to the Court's Amended Case Management Order Re: Claim Construction Schedule (Dkt. No. 64), Defendants submit their Responsive Claim Construction Brief concerning U.S. Patent Nos. 5,960,029; 7,443,906; 8,121,173; and U.S. Reissue Patent Nos. 40,253; 44,530; and 44,591.

In Plaintiff's Opening Claim Construction Brief, Plaintiff asks the Court to adopt constructions that ignore the patentee's admissions on the proper scope of the claims during the years of examination, reexamination, and reissue, and to ignore the unequivocal disclosure of the specifications.  Plaintiff's approach is contrary to basic principles of claim construction, and is contrary the understanding of one of ordinary skilled in the art.

Even for terms where Plaintiff argues in favor of "no further construction," its claim interpretations are far afield from the claim language, specification and prosecution history.  Rather than provide clarity concerning the metes and bounds of the claim language, Plaintiff's proposals seek to introduce ambiguity, postpone claim construction disputes until trial or simply improperly broaden the scope of the claim to allow the Plaintiff to maintain its otherwise untenable infringement accusations.   For example, Plaintiff argues that no construction is needed for "plurality of data channels," but argues that "plurality" means "*one* or more" (emphasis added).  This reading conflicts with the plain meaning of the claim term and renders the term unnecessary.

For the reasons set forth below and in their opening claim construction brief , Defendants respectfully request that Defendants' proposed constructions be adopted.

## II.   CONSTRUCTION OF DISPUTED CLAIM TERMS

### A.   The '029 Patent

#### 1.   "dual-channel QPSK modulator/modulating"[1]

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| a modulator where two distinct, independent data streams are separately presented to the I and Q branches and remain independent throughout the modulator. | a modulator where two distinct, independent data streams are Walsh coded and presented to the I and Q branches of a QPSK spreader.  Different signals are presented to the I and Q branches. |

Plaintiff agrees that the '029 patent does not cover "balanced QPSK" modulators and that, for purposes of the '029 patent, a "dual channel QPSK" modulator is distinct from a "balanced" architecture.  Plaintiff's Op. Br. at 32.  The parties dispute whether the "two distinct, independent data streams" in a dual channel QPSK modulator must "remain independent throughout the modulator" as Defendants propose.

Although the parties rely on 2009 reexamination proceedings to support their views on the dividing line between "balanced" and "dual channel" QPSK modulators in the claims of the '029 patent, only Defendants properly reconcile the cited Gilhousen prior art that the patent owner unambiguously distinguished in the 2009 reexamination with the scope of the claims.

Defendants' proposed construction articulates the key distinction of the claimed "dual-channel QPSK modulator" from the disclaimed "balanced modulator," as reflected in the intrinsic evidence—the claimed modulator not only *receives* distinct, independent Walsh coded data streams as inputs, but it also

---

[1] The parties agree that dual-channel QPSK modulating means "modulating using a dual-channel modulator."

1    *processes* those inputs so that data streams remain different throughout the

2    modulator, as Defendants propose.

3              (a)      **Plaintiff Unambiguously Distinguished the Entirety of**

4                       **Gilhousen as a "Balanced" QPSK Modulator**

5              In the 2009 reexamination, in order to distinguish the modulator shown in

6    Figures 4a – 4c of the Gilhousen prior art, the patent owner and its expert, Dr. Parsa,

7    distinguished Gilhousen as "disclos[ing] *only* a 'balanced' QPSK modulation

8    method," not dual channel.  *See* Ex. E to Defendants' Op. Br., Response to Final

9    Office Action Mailed April 23, 2010 in Ex Parte Reexamination, at p. 41 (emphasis

10   added); *see also* Ex. 10 to Plaintiff's Op. Br., Decl. of Kourosh Parsa, Ph.D., June

11   23, 2010, at ¶¶20-21.   These statements were not limited to distinguishing one

12   figure; instead they distinguished Gilhousen *as a whole* as "disclos[ing] only a

13   'balanced' QPSK modulation method."   For example, Dr. Parsa explained that

14   Gilhousen "discloses a 'balanced' QPSK modulator" and referred to both the cell

15   site modulator of Figures 4a – 4c and the mobile unit transmit modulator of Figure

16   11.  *Id.* ¶ 20.  He then concludes that "Gilhousen disclose[s] only a 'balanced'

17   QPSK modulator, not a 'dual-channel' QPSK modulator."  *Id.* ¶ 21.

18             Tellingly, in its opening brief, Plaintiff does not discuss or compare the QPSK

19   modulator shown in Figures 4a – 4c of Gilhousen to claim 1 of the '029 patent.

20   Instead, Plaintiff points to Figure 11 in Gilhousen, which shows another

21   embodiment, and incorrectly argues that "the '029 patent was distinguished because

22   Gilhousen shows only a single signal that is presented as an input."  Plaintiff's Op.

23   Br. at 36 (emphasis removed).  It quotes a portion of the patent owner's response

24   discussing Figure 11, not Figures 4a – 4c.  *Id.*  This misleading argument is a

25   transparent attempt to avoid the clear consequences of the patent owner's

26   admissions during reexamination.  The unambiguous disavowals were responsive to

27

28

1    the *ex parte* reexamination petition, which maps Figures 4a – 4c to the claim

2    language, not Figure 11.[2]

3            Figures 4a – 4c of Gilhousen show two distinct, independent data streams,

4    namely, the voice channel (i) data and the voice channel (j) data, that are Walsh

5    coded and provided as inputs to the QPSK spreading circuitry of the that modulator.

6    Wicker Decl. at ¶146.  Indeed, Dr. Parsa admitted this in his declaration:

7                    In the cell-to-mobile link, pilot sync, paging and ***voice***
                ***channels*** are defined.  Information encoded on the cell-
8                    to-mobile link are, in general, encoded, interleaved, bi-
9                    phase shift key (BPSK) modulated with orthogonal
                    covering of each BPSK symbol [i.e., Walsh coded] along
10                   with quadrature phase shift key (QPSK) spreading of the
11                   covered symbols.

12   Ex. 10 to Plaintiff's Op. Br., at ¶20 (emphasis added).  Thus, Dr. Parsa

13   acknowledged that Figures 4a – 4c of Gilhousen disclose a modulator where two

14   distinct, independent data streams are Walsh coded and presented to the I and Q

15   branches of a QPSK spreader.

16           Having distinguished Gilhousen as balanced, Plaintiff cannot now propose a

17   construction that encompasses the modulator shown in Gilhousen Figures 4a – 4c.

18   Plaintiff's claim construction proposal cannot be correct.[3]  *See* Wicker Decl. at ¶¶

19   146-157.

20   _____

21           [2]   The Patent Office granted reexamination of the '029 patent and found a

22   substantial new question of patentability based on Gilhousen Figures 4a – 4c, not

23   Figure 11.  *See* Ex. A, Order Granting Request For Ex Parte Reexamination, at p. 5,

     ¶7.  Therefore, the statements made about Gilhousen only disclosing a balanced

24   modulator apply to the modulator depicted in Figures 4a – 4c.

25           [3]   Independent of the patent owner's disavowal, the Gilhousen modulator is

26   properly characterized as "balanced," because the distinct and independent inputs to

     the spreading element of the modulator are multiplied by different spreading codes

27   in the spreader and then ***each*** provided to the I and Q branches of the modulator.

28   Stated differently, the modulator shown in Figures 4a – 4c is balanced because both
                        (footnote continued)

(b)     **Plaintiff's Construction Is a Bald Attempt to Maintain Its Improper Infringement Read Across Its Different Asserted Patents**

Plaintiff recognizes an inherent conflict between the coverage of the '029 patent and the coverage of the '385 and '507 patents in suit.   Plaintiff asserts the '385 and '507 patents against the same accused functionality as the '029 patent. However, based on the clear disavowal by the patent owner of a balanced architecture in the QPSK modulator, the patents simply cannot cover the same type of modulators.  As a result, in order to maintain its infringement read based on both the '029 patent and the '385 and '507 patents, Plaintiff is improperly attempting to recapture the disavowed modulator structure through claim construction.

Although the term "complex spreading circuit" does not appear in the '029 patent, Plaintiff asserts that its construction covers a QPSK modulator implemented using a "complex spreading circuit":

> For example, a dual-channel QPSK modulator may be used in conjunction with an electronic component called complex spreading circuit, and when the  modulator is used with a complex spreading circuit, the two inputted data streams need not remain distinct and independent throughout the modulator.

Plaintiff's Op. Br. at 34.  This is plainly an attempt to stretch the "dual channel" QPSK modulator of the '029 patent to cover the disclaimed "balanced" architecture that appears in its asserted '385 and '507 patents.

During the tutorial in the prior SPH litigation before this Court, however, Plaintiff's counsel explained how the QPSK modulator of the '385 patent receives dual-channel inputs that are "balanced" in a complex spreader:

> ***This is sort of building on the technology of the '029 patent that we saw earlier.***  There is a two-step spreading

input data streams end up in both branches of the modulator before transmission. Wicker Decl. at ¶¶153-157.

5

1
2
3

process.  Remember we have first the Walsh codes.
We've got dual channels, so you've got two different
channels coming in.  And then you've got a second
spreading step process.

4
5
6
7
8

But now in complex spreading, what you're doing is
*you're taking a little bit of the I channel and you're
putting it on the Q channel, and you're putting a little
bit of the Q on the I.*  And the purpose of it is -- what it's
doing is it's sort of *balancing* the power levels a little bit
behind each.

9
10
11
12

*See* Ex. B (emphasis added), Reporter's Transcript of Proceedings Tutorial Hearing,
July 14, 2011 in *SPH America, LLC v. Acer, Inc. et al.*, Case No. 09CV2535-JAH,
at p. 83.  In the context of the statement above, Plaintiff was referring to the
following figure from its tutorial PowerPoint presentation:

13
14
15
16
17
18
19
20
21
22
23



24
25
26
27
28

*See* Ex. D, Plaintiff SPH's Tutorial slides at p. 27, July 14-15, 2011, in *SPH
America, LLC v. Acer, Inc. et al.*, Case No. 09CV2535-JAH and later CAB.  The
effect of using a complex spreading circuit, or any other spreading circuit that feeds
the independent data it receives into both the I and Q branches of a modulator, is to
balance the signals in the two branches of the modulator and make it a "balanced"

6

modulator.  This is reflected in the figure above by the fact that the value "a" that comes from the I channel input is multiplied as part of each of the I channel output ("**ac** – bd") and the Q channel output ("**a**d + bc"); similarly the value "b" that comes from the Q channel input is multiplied as part of each of the I channel output and the Q channel output.[4]

Like the figure shown above, the spreading circuitry in Gilhousen Figures 4a – 4c is an example of a spreading circuit that balances the modulator.  Plaintiff disavowed balanced modulators during reexamination to distinguish Gilhousen. Plaintiff's proposed construction here improperly attempts to recapture the disclaimed balanced architecture.   Plaintiff's motive is to maintain infringement accusations of the "balanced" QPSK modulators of the '385 and '507 patents, while at the same time asserting infringement of the "dual channel" QPSK modulator of the '029 patent.  In view of the '029 patent reexamination proceedings and the disclaimer of Gilhousen, Plaintiff cannot have it both ways.

(c)    **Defendants' Construction Is Consistent with the '029 Patent Specification and the Preferred Embodiment**

The specification and claims of the '029 patent describe a dual-channel QPSK modulator.  As shown in the annotated version of Figure 1 below (from Plaintiff's tutorial in the *SPH v. Acer* case), the data streams that enter the dual-channel QPSK

_____

    [4]   In the figure from SPH's tutorial, the I and Q channel output signals are eventually provided to additional circuitry in the modulator to modulate the I channel data onto a cosine wave signal and the Q channel data onto a sine wave signal.  The so-called OCQPSK modulator described in the tutorial (a specific type of QPSK modulator) is a balanced modulator because the Walsh coded input signal labeled "a" is multiplied by the spreading codes labeled "c" and "d", and the "a" signal multiplied by the appropriate spreading codes is provided to both the I and Q-channels.  Similarly, the Walsh coded input signal labeled "b" is multiplied by the spreading codes labeled "c" and "d", and the "b" signal multiplied by the appropriate spreading codes is provided to both the I and Q-channels.

7

1 │ modulator on the left side of the figure remain distinct and independent throughout

2 │ the modulator:



FIG. 1

*See* Ex. D (attached hereto), Plaintiff SPH's Tutorial slides at p. 15, July 14-15,

2011, in *SPH America, LLC v. Acer, Inc. et al.*, Case No. 09CV2535-JAH and later

CAB; *see also id.* at p. 16-22.

(d)     **At Best, Plaintiff's Construction Is Ambiguous**

Plaintiff's construction consists of two sentences from its expert's, Dr.

Parsa's, declaration submitted during reexamination of the '029 patent.  The first

requires that "two distinct, independent data streams are Walsh coded and presented

to the I and Q branches of a QPSK spreader."  The second sentence states that

"[d]ifferent signals are presented to the I and Q branches."  Plaintiff's position on its

own proposed construction would render the second sentence superfluous.

Defendants, on the other hand, contend that the second sentence properly has

meaning separate and apart from the first sentence.  By requiring that different

signals are presented to the I and Q "branches," the patent owner required different

inputs to the sine and cosine "amplitude modulating means" of the asserted claims.

The "I and Q branches" of the claimed QPSK modulator (which includes the

claimed first and second amplitude modulating means) are by definition the inputs to these modulating means.  In a QPSK modulator, the I branch is defined as the signal that is modulated by the cosine wave signal (in multiplier 17a in the cropped version of figure 1 from the '029 patent below) and the Q branch is defined as the signal that is modulated by the sine wave signal (in multiplier 17b in the figure below).



Dr. Parsa's definition (and thus Plaintiff's construction) was never adopted by the Examiner during the reexamination proceeding.  Indeed, in the Statements of Reasons for Patentability and/or Confirmation, the Examiner noted that "the invention is characterized as a 'dual-channel' QPSK system that receives ***and processes*** two distinct input I and Q signals," suggesting that merely receiving distinct inputs is not sufficient.  There must also be ***processing*** of two distinct input signals.  *See* Ex. G to Defendants' Op. Br. at p. 2.  Defendants' proposed construction clarifies what is meant by the second sentence of Dr. Parsa's proposed definition.

Although the construction that Plaintiff proposes now was an agreed construction in prior litigation, the experts in that prior litigation disputed the meaning of the terms in the agreed construction during expert discovery.

9

Defendants' proposed construction here seeks to resolve the ambiguity in Plaintiff's proposed construction laid bare in the prior lawsuit. *See O2 Micro Int'l Ltd. v. Beyond Innovation Technology Co., Ltd., et. al.,* 521 F.3d 1351, 1362-63 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.")

## B.     The '906/'173 Patents

The parties' disputes regarding the '906 means-plus-function terms primarily involve two issues.  First, Plaintiff's constructions omit function-defining claim language for five disputed terms: (1) "channel coding means," (2) "code generating means," (3) "spreading means," (4) "first logical operation means," and (5) "second logical operation means."  Plaintiff's constructions eliminate language in the "wherein" and "thereby" clauses that describe the function performed.  As explained below and in Defendants' opening brief, this is improper.  Second, the parties dispute the level of specificity that should be included in the proposed structure. The specification must provide adequate disclosure of structures for means-plus-function claim language.  "[A] bare statement that known techniques or methods can be used does not disclose structure" in the context of a means-plus-function limitation. *Biomedino, LLC v. Waters Technology Corp.,* 490 F.3d 946, 952 (Fed. Cir. 2007).  Defendants' proposed structures properly include details from the only related disclosures in the specification, and which inform one of ordinary skill in the art of the metes and bounds of these means-plus-function terms.

Additionally, Plaintiff relies heavily on its purported claim construction victories in the prior case, repeatedly emphasizing that Defendants' proposed constructions should be rejected because the Court considered and rejected them in the prior case. *See* Plaintiff's Op. Br. at 16-17.  This is a misrepresentation of what occurred there.  While it is correct that the current Defendants' proposed constructions are substantially similar to the proposed constructions by the defendants in the prior case, the parties there later reached agreements that narrowed

10

1    the issues in dispute prior to the claim construction hearing.  *See*, e.g., Ex. E at

2    Exhibits A-4 and B-4 (Joint Statement of Information for Telephonic Status

3    Conference).  In fact, the <u>only</u> claim construction dispute presented to the Court was

4    the parties' dispute regarding the "spreading means" limitation.  Ex. B to

5    Defendants' Op. Br. at 192-203 and 224-226 (Hearing Transcript).  None of the

6    other issues presented here for the '906 patent were heard by the Court previously,

7    let alone rejected.[5]

8         1.    <u>"channel coding means for . . ."</u>

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| <u>Function</u>: encoding the source data to generate (N-1) data parts and a control part, wherein the data parts are allocated to the data channels and the control part is allocated to the control channel.<br><br><u>Structure</u>: Encoder (110) shown in Figs. 1, 3, 5-7, and equivalents thereof. | <u>Function</u>: encoding the source data to generate (N-1) data parts and a control part).<br><br><u>Structure</u>: encoder (110), and equivalents thereof.<br><br>The "wherein…" portion does not need further construction. |

16   Defendants' proposed construction properly includes the "wherein" clause,

17   "wherein the data parts are allocated to the data channels and the control part is

18   allocated to the control channel," in the function.  Plaintiff does not argue that this

19   clause is a "mere result," because it is not.[6]  Instead, Plaintiff makes only a single

20   conclusory statement supporting its position that this language should be excluded,

_____

[5] Plaintiff's arguments regarding the definiteness of the term "spreading factor generation means" are being addressed through the briefing supporting Defendants' Motion for Summary Judgment of Indefiniteness of U.S. Patent No. 7,443,906, Docket No. 77.

[6] As discussed in Defendants' Opening Brief, the "wherein" clause here defines the allocation of "data parts" and "control part" during the "encoding" function.  It does not define an intended result, but rather, critically defines the necessary routing and is part of the function.  Defendants' Op. Br. at 16-17.

stating without support that the "wherein" clause "is merely a description of the data parts and the control part."  Plaintiff's Op. Br. at 18.  But tellingly, Plaintiff wholly ignores the fact that this very "wherein" language was added to obtain allowance of the '906 patent from the PTO.  *See* Ex. H to Defendants' Op. Br., Response to Office Action Mailed July 2, 2003; *see also* Defendants' Op. Br. at 15-16.  A patentee cannot rely on a "wherein" clause to obtain allowance of the patent and then ignore it during litigation, as Plaintiff attempts to do here.  *See, e.g., Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).  Accordingly, the Court should adopt Defendants' proposed function.

Plaintiff also argues that Defendants' proposed structure is improper because it includes citation to figure numbers.  Specifically, Defendants' proposed construction relies on Figs. 1, 3 and 5-7, which disclose a particular structure for the encoder (110).  While Plaintiff cites the *Budde* case without explanation in its brief for the general proposition that the specification must be read as a whole to determine the proper structure, this case is inapposite because Plaintiff does not identify any alternative portions of the specification which describe the encoder.  In *Budde*, the District Court construed the recited function too narrowly and therefore ignored extensive disclosures of structure in the specification for performing the proper, broader function.  *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1378-79 (Fed. Cir. 2001).  Here, in contrast, Defendants' constructions do not ignore any structural disclosures recited in the specification, but instead attempt to include specific disclosures that Plaintiff's constructions omit.  That case further did not involve the issue of including specific details from the specification's only disclosures of structure to perform the claimed function, as Defendants seek to do here – in fact, *Budde* involved a Defendant who sought to include no structure at all to support its indefiniteness argument.  Therefore, Defendants' proposed construction properly identifies the disclosed structure in light of the specification as a whole and should be adopted.

### 2.    "code generating means for . . ."

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| <u>Function</u>: generating spreading codes to be allocated to the channels, wherein each of the spreading codes is selected on the basis of a data rate of the data part and the control part and spreading codes are selected so that two consecutive pairs of the I and Q data are correspondent to two points located on the same point or symmetrical with respect to a zero point on a phase domain.<br><br><u>Structure</u>: Spreading Code Generator shown in FIG 4, as well as in FIGS 3, 5-7 as Spreading Code Generator (121), and defined by 6:6-16 and 6:42-7:36, and equivalents thereof. | <u>Function</u>: generating spreading codes to be allocated to the channels.<br><br><u>Structure</u>: spreading code generator (121), and equivalents thereof.<br><br>The "wherein…" portion does not need further construction. |

The parties' only dispute regarding the proposed function here is whether Defendants' proposed function is improper because it includes a "wherein" clause:

> …wherein each of the spreading codes is selected on the basis of a data rate of the data part and the control part and spreading codes are selected so that two consecutive pairs of the I and Q data are correspondent to two points located on the same point or symmetrical with respect to a zero point on a phase domain.

Plaintiff again fails to provide any support for its position that the "wherein" clause should be read out of the claim, stating without explanation or support that the "wherein" clause is "not part of the function here" and "merely describes the spreading codes."  Plaintiff's Op. Br. at 19.  Here too, Plaintiff does not argue that this clause is a "mere result," because it cannot.  In fact, this clause is part of the function because it further defines what the "code generating means" generates – spreading codes that are selected "on the basis of the data part and the control part" and "so that two consecutive pairs of the I and Q data are correspondent to two

13

points located on the same point or symmetrical with respect to a zero point on a phase domain."  This feature is stressed throughout the specification, and the generation and use of the particular codes described in the "wherein" clause is described as the object of the purported invention.  *See, e.g.*, '906 Patent at Abstract, 2:6-12, 2:23-30, 2:41-48, 2:59-65, 3:8-14.  Thus, this language is an important part of the function, and to write it out of the construction would be improper.

As with the previous term, Plaintiff's proposed alternative construction is also improper because it would eliminate language that was added to obtain allowance of the claim.  *See, e.g., Southwall*, 54 F.3d at 1576.  Specifically, the language that Plaintiff now seeks to ignore was used to overcome prior art during prosecution of the '906 patent, when the applicants intentionally tied the "wherein" language to the generation of spreading codes and argued that the spreading codes must be generated only as described by this clause.  *See* Ex. H to Defendants' Op. Br., Response to Office Action Mailed July 2, 2003 at 27-28; *see also* Defendants' Op. Br. at 18-19.  Plaintiff completely ignores this history in its conclusory argument that this language should be excluded from the function.  The "wherein" language here was added specifically to differentiate the claimed invention from the prior art during patent prosecution, and Defendants' proposed function should therefore be adopted.

The parties also dispute whether the structure for the "code generating means" should include citation to Figures 3, 4, 5, 6, and 7, and the text at 6:6-16 and 6:42-7:36 in the specification, which identify and describe the "spreading code generator (121)" (as labeled in Figure 4) that both parties agree is part of the structure.  Plaintiff's only opposition to the inclusion of these citations in the construction is that "the spreading code generator (121) is described throughout the specification and not just in the portions cited by Defendants."  Plaintiff's Op. Br. at 19.  Plaintiff points to column 8, lines 1-42 in support of this argument.  But that portion of the specification is merely duplicative of Defendants' proposed construction, describing

14

the "spreading code generator" in substantially the same way as the figures and portions of the specification cited by Defendants.  Thus, the Court should adopt Defendants' structure.

### 3. "spreading means for . . ."

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| <u>Function</u>: spreading the control channel and the data channels by using the spreading codes to thereby generate the channel-modulated signal.<br><br><u>Structure</u>: The combination of Spreader (130), Scrambler (140), Filter (150), Gain Adjuster (160), and Adder (170) in the arrangement shown in Fig. 3 and defined by 6:23-41, and equivalents thereof. | <u>Function</u>: spreading the control channel and the data channels by using the spreading codes.<br><br><u>Structure</u>: spreader (130), and equivalents thereof.<br><br>The "wherein…" portion does not need further construction. |

In arguing that the "thereby" clause in the "spreading means" is a "mere result" and therefore should be excluded from the construction of this term, Plaintiff relies on the Court's previous ruling in the *SPH v. Acer* case and *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003).  With respect to this Court's prior ruling, the present Defendants were not parties to that claim construction proceeding.  As to Plaintiff's reliance on *Lockheed*, that case is inapposite and does not support Plaintiff's position.  There, the Court concluded that a clause was a mere result in construing materially different patent claims than those at issue here.[7]  The "whereby" clause in *Lockheed* described the "necessary result of

---

[7] The claim in *Lockheed* read as follows: "means for rotating said wheel in accordance with a predetermined rate schedule which varies sinusoidally over the orbit at the orbital frequency of the satellite, *whereby the attitude of said satellite is offset **in response to the effect of said rotating wheel** by the direction of the pitch axis being changed with respect to said momentum vector, the direction of said pitch axis with respect to the inclined orbit normally varying sinusoidally at the orbital frequency to null said rolling pointing error due to said orbit inclination, the*
(footnote continued)

rotating the wheel, *i.e.* offsetting the attitude of a satellite in a particular manner." *Intergraph Hardware Technologies Co. v. Toshiba Corp.*, 508 F. Supp. 2d 752, 769 (N.D. Cal. 2007). The claim language at issue in *Lockheed* acknowledged that the phrase is the "effect" (*i.e.*, result) of the "means for rotating" element (as shown in bold in the footnote below). Here, in contrast, the "thereby" clause does not self-describe itself as an effect or result, but instead further defines the claimed function. Unlike the language in *Lockheed*, nothing in this claim language indicates that the clause is simply the necessary result of the recited spreading means. Rather, the claim language describes the function of the spreading means as both spreading the control and data channels by using the spreading codes *and also* generating the channel-modulated signal. The "thereby" clause is a defining part of the function, and therefore the Court should adopt Defendants' proposed function.

By contrast, in *Convolve, Inc. v. Dell, Inc.*, 2011 WL 31792 (E.D. Texas 2011), the Court faced similar claim language than at issue here. The parties disputed whether the function included the limitation "to reduce selected unwanted frequencies from a plurality of frequencies in accordance with the altered settings in the user interface." Both parties relied on *Lockheed*, but the Court agreed with Defendants' proposal:

> Plaintiff seeks to remove a clause from the claimed function that describes how the function is implemented but retain that language as a limitation on the claim. Specifically, the claimed invention '[causes] the processor to output commands to the data storage device to alter seek trajectory shape ... in accordance with the altered settings in the user interface.' The clause Plaintiff wishes to exclude is not the result of the recited function, but the essence of the function itself.

*Id.* Like the claim language in *Convolve*, the "channel-modulated signal" is not a mere result but is "the essence of the function itself."

---

*momentum vector being maintained perpendicular to the plane of the geosynchronous orbit to null said yaw pointing error due to said orbit inclination*." *Lockheed*, 324 F.3d at 1319 (emphasis added).

With respect to Defendants' proposed structure, Plaintiff argues that the scrambler (140), filter (150), gain adjuster (160) and adder (170) are "extraneous structures" that are "unnecessary to perform the claimed function." Plaintiff's Op. Br. at 11. This issue appears to turn on the parties' disagreement regarding whether the "thereby" clause further defines the claimed function. Defendants' inclusion of the scrambler (140), filter (150), gain adjuster (160) and adder (170) is proper because those structures are necessary to perform the function recited in the "thereby" clause, which is "to thereby generate the channel-modulated signal" as required by the language of the claim. For example, although the spreader 130 spreads the control part and the one or more data parts using spreading codes, a channel-modulated signal is not generated until after the adder 170 sums the gain-adjusted signal. *See* '906 Patent at 6:39-41. After being spread by the spreader 130, the control part and one or more data parts then pass through the scrambler 140, filter 150 and gain adjuster 160, before reaching the adder 170. Thus, in order to perform the entire function, the corresponding structure must include the spreader 130, scrambler 140, filter 150, gain adjuster and adder 170. For all the reasons discussed above and in Defendants' opening brief, Defendants' proposed function should be adopted.

### 4. "first spreading code generation means . . ." and "second spreading code generation means . . ."

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Function: generating the spreading code to be allocated to the data channel in response to the count value and the spreading factor. | Function: generating the spreading code to be allocated to the data channel in response to the count value and the spreading factor. |
| Structure: logical operator (231) and in combination with multiplexer (232) as defined by Fig. 4 and 6:59-7:33, and equivalents thereof. | Structure: logical operator (231) and multiplexer (232), and equivalents thereof. |
| Function: generating the spreading code | Function: generating the spreading code |

17

| | |
|---|---|
| to be allocated to the control channel in response to the count value and the spreading factor.<br><br>Structure: logical operator (233) and in combination with multiplexer (234) as defined by Fig. 4 and 6:66-7:33, and equivalents thereof. | to be allocated to the control channel in response to the count value and the spreading factor.<br><br>Structure: logical operator (233) and multiplexer (234), and equivalents thereof. |

The only dispute between the parties regarding these terms is whether the structures for the first/second "spreading code generation means" should include the figure and text citations that are part of Defendants' proposed constructions, which citations are to the only portions of the specification that disclose structures that perform the recited functions. Plaintiff's support for its position that these citations should not be part of the construction of these terms is its claim that "the logical operators and multiplexers are described throughout the specification and not only in the portions cited by Defendants." Plaintiff's Op. Br. at 19. Plaintiff's bare claim is inaccurate, because the only structural references in the '906 patent to logical operators 231 and 233, and multiplexers 232 and 234, is found in the text and figure included in Defendants' proposed construction. All other generic references to logical operators and multiplexers, including the only citations provided by Plaintiff—14:37-41 and 14:53-15:7—describe the flowcharts contained in Figs. 20-22 that are purely functional in nature. Defendants' constructions accurately include the only parts of the patent that disclose structures to perform the recited "generating the spreading code" functions, and therefore should be adopted.

### 5. "second logical operation means . . . for carrying out . . ." and "first logical operating means . . . for carrying out . . ."

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Function: carrying out a logical operation with the spreading factor and the code number related to the control part to thereby generate the spreading code related to the control part in | Function: carrying out a logical operation with the spreading factor and the code number related to the control part in response to the count value.<br><br>Structure: logical operator (233), and |

18

| | |
|---|---|
| response to the count value.<br><br>Structure: logical operator (233) as defined by Fig. 4 and 6:59-7:29, and equivalents thereof. | equivalents thereof.<br><br>The "thereby . . ." portion does not need further construction. |
| Function: carrying out a logical operation with the spreading factor and the code number related to the data part, to thereby generate the spreading code related to the data part in response to the count value.<br><br>Structure: logical operator (231) as defined by Fig. 4 and 6:59-7:29, and equivalents thereof. | Function: carrying out a logical operation with the spreading factor and the code number related to the data part in response to the count value.<br><br>Structure: logical operator (231), and equivalents thereof.<br><br>The "thereby . . ." portion does not need further construction. |

In arguing that the "thereby" clauses of these terms should be excluded from the construction of their functions, Plaintiff states only that the "thereby" clause "is not part of the function, but merely describes the result," relying on *Lockheed*. Plaintiff's Op. Br. at 20. Plaintiff provides no basis for this conclusory statement, nor does it explain how the "thereby" clauses at issue in the "logical operation means" terms are analogous to those in *Lockheed*. Indeed, they are not. In contrast to the language at issue in that case, the "thereby" clauses here do not recite mere results, but instead describe how the first and second logical operations means work to generate spreading codes. These "thereby" clauses are part of the function, and thus should be included in the construction, as Defendants propose. *See Competitive Technologies*, 286 F.Supp.2d at 1187-1188 (N.D. Cal. 2003); *Intergraph*, 508 F.Supp.2d at 768-769.

The parties agree that the proposed structures for these terms should be logical operators 233 and 231, but dispute whether text and figure citations should be included in the structure constructions. As with the previous terms, Plaintiff argues that such text and figure citations are improper because the logical operators 233 and 231 are "described throughout the specification and not just in the portions cited by Defendants." Plaintiff's Op. Br. at 20. Plaintiff identifies only the text at

19

14:37-39, 14:53-15:5, and Figs. 20-22 of the '906 patent in support of this argument. But again, Plaintiff is wrong.  The only references to logical operators 233 and 231 in the specification are those made with respect to Figure 4 in the text that Defendants include in their constructions.  The text and figures that Plaintiff identifies only show functional flowcharts, and are not structural descriptions.  Thus, Defendants' proposed structures include the sole disclosures of the structures that perform the recited functions for the first/second "logical operation means."

### 6. "second selection means for . . ." and "first selection means for . . ."

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| Function: outputting the spreading code related to the control part in response to a select signal as the spreading factor related to the control part. | Function: outputting the spreading code related to the control part in response to a select signal as the spreading factor related to the control part. |
| Structure: multiplexer (234) of Fig. 4, and equivalents thereof. | Structure: multiplexer (234), and equivalents thereof. |
| Function: outputting the spreading code related to the data part in response to a select signal as the spreading factor related to the data part. | Function: outputting the spreading code related to the data part in response to a select signal as the spreading factor related to the data part. |
| Structure: multiplexer (232) of Fig. 4, and equivalents thereof. | Structure: multiplexer (232), and equivalents thereof. |

Here, again, Plaintiff argues that Defendants improperly include Figure 4 and the associated text in the specification into the corresponding structure.  Contrary to Plaintiff's contention that the multiplexers 234 and 232 are described throughout the specification, these structures are *only* disclosed in Figure 4 and the accompany text at 6:59-7:33.  All other generic references to logical operators and multiplexers are purely functional in nature, including the flowchart descriptions cited by Plaintiff at 14:40-41, 15:6-7, and Figs. 20-22.

With respect to Plaintiff's statement that item "232" is not a "logical operator … of Fig 4," but rather a multiplexer, Defendants agree.  The reference to a "logical operator" rather than a multiplexer was a typographical error.

### 7.    Dependent Claims 16 and 18

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "16. The apparatus as recited in claim 15, wherein the first logical operation means carriers out a logical operation of $\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$ if the predetermined spreading factor is $2^N$ where N is 2 to 8." | |
| This claim limitation narrows the recited function of a §112 ¶6 claim element.<br><br>Function: The function of "carrying out a logical operation with the spreading factor and the code number related to the control part, to thereby generate the spreading code related to the control part in response to the count value" is further limited to "carrying out a logical operation of $\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$ if the predetermined spreading factor is 2N where N is 2 to 8."<br><br>Structure: logical operator (231) as defined by Fig. 4 and 6:59-7:29, and equivalents thereof. | This claim limitation narrows the recited function of a §112 ¶6 claim element.<br><br>Function: The function of "carrying out a logical operation with the spreading factor and the code number related to the control part, to thereby generate the spreading code related to the control part in response to the count value" is further limited to "carrying out a logical operation of $\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$ if the predetermined spreading factor is 2N where N is 2 to 8."<br><br>Structure: logical operator (231), and equivalents thereof. |
| "18.  The apparatus as recited in claim 17, wherein the second logical operation means carries out a logical operation of $\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$ if the predetermined spreading factor is $2^N$ where N is 2 to 8." | |
| This claim limitation narrows the recited function of a §112 ¶6 claim | This claim limitation narrows the recited function of a §112 ¶6 claim element. |

21

| | |
|---|---|
| element.<br><br>Function: The function of "carrying out a logical operation with the spreading factor and the code number related to the control part, to thereby generate the spreading code related to the control part in response to the count value" is further limited to "carrying out a logical operation of<br><br>$$\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$$<br><br>if the predetermined spreading factor is 2N where N is 2 to 8."<br><br>Structure: logical operator (233) as defined by Fig. 4 and 6:59-7:29. | Function: The function of "carrying out a logical operation with the spreading factor and the code number related to the control part, to thereby generate the spreading code related to the control part in response to the count value" is further limited to "carrying out a logical operation of<br><br>$$\prod_{i=0}^{N-2} \oplus I_i \cdot B_{N-1-i}$$<br><br>if the predetermined spreading factor is 2N where N is 2 to 8."<br><br>Structure: logical operator (233), and equivalents thereof. |

For these claims, Plaintiff merely states that Defendants' proposed constructions should be rejected for the same reasons as those set forth for the terms "second logical operations means…" and "first logical operations means…" Plaintiff's Op. Br. at 23.  Plaintiff's argument as to these claims is therefore without merit for all the reasons discussed above in the section for the terms in "second logical operations means…" and "first logical operations means…"

**8. "counting means for consecutively producing a count value in synchronization with a clock signal"**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| This limitation is governed by 35 U.S.C. § 112, ¶ 6.<br><br>Function: "consecutively producing a count value in synchronization with a clock signal."<br><br>Structure: 8-Bit Counter (220) shown in FIG 4, and equivalents thereof. | This is a §112 ¶ 6 claim element.<br><br>Function: consecutively producing a count value in synchronization with a clock signal.<br><br>Structure: counter (220), and equivalents thereof. |

The parties agree that this term is subject to 35 U.S.C. § 112, ¶ 6, and agree on the recited function.  The only dispute is whether term "counting means for

22

consecutively producing a count value in synchronization with a clock signal" is limited to the particular corresponding structure disclosed in the specification (as Defendants propose) or more ambiguous structure of "counter" proposed by Plaintiff.

Plaintiff's brief begins by arguing that the corresponding structure should not be limited to an "8-bit" counter. Plaintiff's Op. Br. at 12. Plaintiff's own proposed corresponding structure, however, refers to the counter that the '906 patent specification labels as element 220. Element 220, in turn, is solely described in the specification as an "8-bit counter 220." Defendants' Op. Br. at 27. There are no references whatsoever to a generic "counter (220)." The only "counter" or element 220 mentioned in the specification is an "8-bit counter 220." Thus, Plaintiff's argument that the structure should be only a "counter (220)," but not an 8-bit counter, distorts the specification and defies common sense.[8]

Second, Plaintiff argues that "counter (220)" need not be 8-bits in length to perform the recited function and thus should not be required as corresponding structure. As discussed below in the context of the other "counter"-related terms, the "count value" in the recited function must be capable of creating a 256-bit spreading code. One of ordinary skill understands that to create a "count value" capable of creating a 256-bit spreading code, one needs an 8-bit counter. *See* Wicker Decl. at ¶ 135. An 8-bit counter is thus required to perform the recited function of creating the claimed "count value." Plaintiff's cited authority of *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371 (Fed. Cir. 2001) is

---

[8] Any construction that finds the corresponding structure as "counter (220)" thus only postpones the dispute until summary judgment or trial because the parties have a claim construction dispute as to the bounds of counter, Element 220. *See 02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.")

thus inapposite.   Unlike the structure in *Acromed*, the 8-bit length of counter 220 is necessary to perform the recited function in the claim, and not a limitation unnecessarily imported from the specification.[9]

### 9.   "plurality of data channels"

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| more than one data channel | This term does not need further construction. |

Offering a seemingly innocuous "no further construction" proposal, Plaintiff's opening claim construction brief reveals the parties' dispute and Plaintiff's overly broad, incorrect construction of "plurality" to mean "***one*** or more" (emphasis added).  Plaintiff's construction gives the word "plurality" a meaning that is entirely the opposite of its plain and ordinary meaning.  Plaintiff's Op. Br. at 30-31. This is contrary to any reasonable understanding of lay persons, one of ordinary skill in the art, and the claim language itself.  A "plurality" cannot mean "one."

In contrast to Plaintiff's proposal, Defendants' construction reflects the scope of this term in the '173 patent under any reasonable interpretation: "plurality" means "more than one."  Plaintiff's expert agreed that the plain and ordinary meaning of "plurality" in this context is "more than one"—exactly the same as Defendants' proposed construction.  Ex. I to Defendants' Op. Br., Vojcic Dep. at 125:25-126:2 (in the context of the '173 patent, "the plain and ordinary meaning [of plurality] would be more than one.").

---

[9] Plaintiff states that the Court declined to include the "8-bit" feature as part of the corresponding feature in the prior SPH case.  Plaintiff's Op. Br. at 13.  That is incorrect, as the parties in the previous case reached agreement regarding the "counting means" term prior to the claim construction hearing there and did not present any disputes for the Court to decide.  *See* Ex. E, Joint Statement of Information for Telephonic Conference with Exhibit A4 '906 Joint Chart; Appx. B (Tr. April 11, 2012 Hrg.).  Accordingly, the construction of this term is one of first impression for this Court.

Plaintiff incorrectly argues that Defendants' construction purportedly excludes preferred embodiments that have "one or more data channels," citing the '173 specification at 5:52-59.  Plaintiff's Op. Br. at 30.  But this single portion of the specification cannot overcome the plain language of the claims, which repeatedly requires "data channels"—plural.  That is, the claim expressly requires "more than one" data channel, as Defendants' proposal recognizes.  This requirement of multiple data channels—a "plurality"—is repeated throughout claim 1 of the '173 patent: Claim 1: "allocated to the data channels . . . the data channels . . . the spreading codes allocated to first and second data channels."  '173 Patent at 15:27-60.  The claim even goes so far to expressly recite "first and second data channels," which necessarily excludes any scenario with only one data channel.  The bare reference in the specification to using "one or more" data channels is thus, at best, an unclaimed embodiment and cannot override the plain claim language.

Accordingly, the Court should adopt Defendants' construction of "plurality of data channels" as "more than one data channel."

### 10.   "a counter"

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| an 8-bit counter | This term does not need further construction. |

### 11.   "consecutively producing a count value in synchronization with a clock signal"

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| using a clock signal to produce an 8-bit binary count value | This term does not need further construction. <br><br> Alternatively: Using a clock signal to produce a count value. |

The parties dispute whether these terms require an "8-bit counter."  While Plaintiff admits that the written specification for the '173 patent "use[s] an 8-bit counter," it ignores the evidence within claim 1 itself that mandates Defendants'

25

construction.  In particular, Plaintiff ignores the requirement in the claims that the counter generate a spreading code with a length of 256 bits, which a person of ordinary skill understands requires at least an 8-bit counter.

Rather than address this key intrinsic evidence, Plaintiff relies on extrinsic evidence in the form of testimony from Defendants' expert, Dr. Wicker, (Plaintiff's Op. Br. at 29), that neither supports Plaintiff's position nor is inconsistent with Defendants' proposed construction.  Dr. Wicker's testimony that the written specification does not include anything "phrased in the negative" concerning "counters" is entirely consistent with Defendants' construction, which is supported by the language of claim 1 of the '173 patent, not any statement "phrased in the negative" found in the specification.  As explained in Defendants' Opening Brief, the claim language requires that the "counter" generate a spreading code with a length of 256 bits.  To do that, one needs a counter of at least 8-bits in length, as Defendants' construction properly recognizes.  Wicker Decl. at ¶ 132.

Plaintiff also relies on other extrinsic evidence in the form of its expert Dr. Vojcic's carefully-wordsmithed declaration that counters of "varying sizes" could be used, which provides little actual support.  Dr. Vojcic, however, admitted at his deposition that he was not putting forward any expert opinion that one could generate the spreading code expressly required by the claim language using less than an 8-bit counter.  Defendants' Op. Br. at 33.  That is, to practice claim 1 of the '173 patent, he agrees that at least an 8-bit counter is necessary.

Plaintiff cites *JVW Enterprises, Inc. v. Interact Accessories*, 424 F.3d 1324 (Fed. Cir. 2005) to support the assertion that a description of a single embodiment does not give license to "import limitations into the claims."  Plaintiff's Op. Br. at 29.  Defendants' proposal commits no such error.  Defendants' construction relies on the requirements of the claim language itself, not a description of a single embodiment in the specification.  As Plaintiff agrees, claim construction in this

1   instance should be derived from the "actual words of the claim."  Defendants'

2   construction is the only one that does so.  Wicker Decl. at ¶ 135.

3       *Pause Technology LLC v. TiVo Inc.*, 419 F. 3d 1326 (Fed. Cir. 2005) is

4   instructive.  There, the Federal Circuit considered whether the term  "circular

5   storage buffer" was limited to a physical circular buffer, or could include logical

6   buffers.  *Id.* at 1329-1330.  The patentee argued that the term "circular storage

7   buffer" was not limited by the claim language or the specification, and the ordinary

8   meaning of the term encompassed both logical and physical "circular storage

9   buffers."  *Id.* at 1330.   Rejecting the patentee's argument, the Court found that the

10  surrounding claim language required that "the *claimed* buffer must write to

11  'continually advancing' physical addresses," which requires a physical "circular

12  storage buffer."  *Id.* (emphasis in original).  The Court explained:

> Pause argues that "[r]egardless of what claim language appears in a later portion of the claim, that language should not be read into the interpretation of a separate claim element."  However, proper claim construction demands interpretation of the entire claim in context, not a single element in isolation. . . . . The "write over" clause and other language appearing later in the claim detail how the buffer employs addressing to store digital signal values in memory. There is no basis for us to ignore that language in properly construing the claim language in dispute.

18  *Pause*, 419 F. 3d at 1331 (alterations, quotes and citations omitted); *see also*

19  *ACTV, Inc. v. Walt Disney Co.,* 346 F.3d 1082, 1088-90 (Fed. Cir.2003) ("While

20  certain terms may be at the center of the claim construction debate, the context of

21  the surrounding words of the claim also must be considered . . . .").  The same

22  analysis applies to the claimed "counter" in the '173 patent.  As explained in

23  Defendants' opening brief, the surrounding claim language requires that the counter

24  generate a code of 256 bits in length, and a person of ordinary skill recognizes that

25  one needs at least an 8-bit counter to accomplish that.  "There is no basis for us to

26  ignore that language in properly construing the claim language in dispute."  *Id.*

27  Thus, like the buffer in *Pause*, the ***claimed*** "counter" must be an 8-bit counter in

28

27

view of the surrounding claim language.  Defendants' construction, which properly takes into account the surrounding claim language, should be adopted.

### 12. "a channel coding unit that encodes the source data to generate a plurality of data parts and a control part, wherein the data parts are allocated to the data channels and the control part is allocated to the control channel"

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| This limitation is governed by 35 U.S.C. §112, ¶6.<br><br>Function: "encodes the source data to generate a plurality of data parts and a control part, wherein the data parts are allocated to the data channels and the control part is allocated to the control channel"<br><br>Structure: Encoder (110) shown in Figs. 1, 3, 5-7, and equivalents thereof. | This limitation is not governed by 35 U.S.C. §112, ¶6.<br><br>Should this term be construed under 35 U.S.C. § 112, ¶ 6, SPH proposes the following:<br><br>Function: encodes the source data to generate a plurality of data parts and a control part.<br><br>Structure: encoder (110), and equivalents thereof.<br><br>The "wherein…" portion does not need further construction. |

### 13. "a second selector that outputs the spreading code to be allocated to the control channel in response to a second select signal" [10]

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| This limitation is governed by 35 | This limitation is not governed by 35 |

---

[10] Defendants maintain that the terms "code generator", "first spreading code generator", and "second spreading code generator" in the '173 patent should be construed under § 112, ¶ 6, as submitted in Defendants' Joint Claim Construction Charts and Worksheets (Dkt. Nos. 50-1 and 50-4).  To streamline the briefing, and for judicial efficiency, Defendants submitted briefing on the issue of whether terms in the '173 patent should be construed under § 112, ¶ 6 for "channel coding unit" and "selector" only.

| U.S.C. §112, ¶6. | U.S.C. §112, ¶6. |
|---|---|
| <u>Function</u>: "outputs the spreading code to be allocated to the control channel in response to a second select signal"<br><br><u>Structure</u>: multiplexer (234) of Fig. 4, and equivalents thereof. | Should this term be construed under 35 U.S.C. § 112, ¶ 6, SPH proposes the following:<br><br><u>Function</u>: outputs the spreading code to be allocated to the control channel in response to a second select signal.<br><br><u>Structure</u>: multiplexer (234), and equivalents thereof. |

Plaintiff's methodology for arriving at its proposed constructions of "channel coding unit" and "selector" in the '173 patent completely ignores step one of the two-step process used to construe a claim term under § 112, ¶ 6. When a claim term does not use "means," the proper process is to, first, determine if the presumption against § 112, ¶ 6 should be rebutted because the claim term fails to recite sufficiently definite structure (the "sufficiently definite structure" step) and, second, identify the corresponding structure (the "corresponding structure" step). *See, Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1097 (Fed. Cir. 2014); *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1097 (Fed. Cir. 2008).

To support its proposed constructions, Plaintiff points to the ***corresponding*** structure in the '173 patent—encoder 110 for the "channel coding unit" and multiplexor 234 for the "second selector." Plaintiff's Op. Br. at 24-25, 28. However, Defendants do not allege that the terms "channel coding unit" and "second selector" lack ***corresponding*** structure (step two, the "corresponding structure" step); Defendants allege that that terms lack ***sufficiently definite*** structure (step one, the "sufficiently definite structure" step). As the Federal Circuit explained, "while these two 'structure' inquiries are inherently related, they are distinct." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296 (Fed. Cir. 2014).

The "sufficiently definite structure" step makes clear that the terms "channel coding unit" and "selector" should be construed under § 112, ¶ 6. Both terms fail to recite sufficiently definite structure because "channel coding unit" and "selector" are

29

generic nonce words and the remaining claim language, specification, prosecution history, and relevant external evidence provide no further structural description to a person of ordinary skill in the art. *See Mass. Inst. Of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006); Wicker Decl. at ¶¶123-31. The specification of the '173 patent *never* uses the term "selector" and *never* uses the term "channel coding unit"—instead using "channel coding means." '173 Patent at 2:16-18; 2:34-35; 2:51-53. Plaintiff should not be permitted to circumvent § 112, ¶ 6 in the '173 patent by substituting "channel coding means" with "channel coding unit" and "selection means" with "selector" from the '906 patent to the '173 patent.

Plaintiff tacitly admits that there is no difference between the "channel coding means" from the '906 patent and the "channel coding unit" from the '173 patent or between the "selection means" and the "selector". Plaintiff relies on its own briefing for the "means" versions of the respective terms in arguing about the proper corresponding structure. Plaintiff's Op. Br. at 25, 28. Moreover, as Dr. Vojcic testified in his deposition, the "channel coding means" and "channel coding unit" are effectively the same thing—something that performs channel coding. Ex. I to Defendants' Op. Br., Vojcic Deposition Transcript, at 127, l. 5-7.

Plaintiff relies on conclusory statements by its expert, Dr. Vojcic, that the "term 'channel coding unit' may be used to refer to a class of structures that does channel coding, such as, *e.g.*, an encoder" and the "term 'selector' may be used to refer to a class of structures that selectively outputs data, such as, *e.g.*, a multiplexor." Plaintiff's Op. Br. at 25, and 28; Dkt. No. 74-1, Vojcic Supp. Decl. at 3-4. Tellingly, neither Plaintiff's Opening Claim Construction Brief nor Dr. Vojcic's Supplemental Declaration cites *any* intrinsic or extrinsic evidence to support these "class of structures" blanket statements. *See id; see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F. 3d 1316, 1329 (Fed. Cir. 2001) ("Broad conclusory statements offered by [Appellant's] experts are not evidence"). Plaintiff cannot support its conclusory statements likely because, as explained by

Dr. Wicker, the terms "channel coding unit" and "selector" were not generally known structures to one of ordinary skill in the art in the 1999-2000 timeframe. Wicker Decl. at ¶¶123-31.

Plaintiff cites the *Inventio* case as allegedly supporting its position.  Plaintiff's Op. Br. at 25; *Inventio AG v. Thyssenkrupp Elevator Ams. Corp.*, 649 F.3d 1350 (Fed. Cir. 2011).  In that case, however, the Federal Circuit relied on the written descriptions of the "computing unit" from the patent specifications.  *Inventio*, 649 F.3d at 1359-60 (citing specific passages in the patents describing a "computing unit").  Similarly, in the *Lighting World* case cited by Plaintiff, the Federal Circuit specifically pointed to citations in the specification describing a "connector assembly" in its analysis.  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1361 (Fed. Cir. 2004) ("The written description of the '460 patent, for example, uses the term 'connector assembly' as the name for structure."); Plaintiff's Op. Br. at 28.  Consistent with this trend, in the *Apple v. Motorola* case relied upon by Plaintiff, the Federal Circuit cited column and line numbers from the patent describing the "heuristic."  *Apple*, 757 F.3d at 1301-03 (*See*, numerous citations to the specification); *see also*, *id.* at 1301 ("The written description provides further details regarding the heuristics' inputs and outputs.")  In contrast, the terms "channel coding unit" and "selector" are entirely absent from the specification and the figures of the '173 patent.  Accordingly, these cases support Defendants' position—that the written description is essential for determining whether a claim term has sufficiently definite structure—rather than Plaintiff's.

Because Defendants' constructions are based on both steps of the two-step process used to construe a claim term under § 112, ¶ 6, Defendants' constructions should be adopted and the terms "channel coding unit" and "selector" should be construed as mean-plus-function terms.

## C.    The '253/'530/'591 Patents

### 1.    "broadcast[ed]" / "broadcast signal"

31

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| transmitted to all terminals within a particular cell / transmission containing information intended for all terminals within a particular cell | These terms do not need further construction.<br><br>Alternatively:<br><br>transmitted to a number of devices within a particular cell / transmission containing information intended for a number of devices within a particular cell |

The parties' dispute regarding this claim term is whether the term covers transmission to less than all terminals within a cell or transmissions containing information intended for less than all terminals within a cell.  Plaintiff incorrectly argues that the term "broadcast[ed]" or "broadcast signal" does not require construction, suggesting that the jury be asked to resolve what is clearly a disputed claim term.  Furthermore, Plaintiff's ordinary meaning conflicts with the intrinsic evidence.

(a)      <b>The Court, Not the Jury, Must Construe This Term</b>

Because the parties dispute the scope of the term "broadcast[ed]" or "broadcast signal," the Court must reject Plaintiff's argument that this term need not be construed.  The Federal Circuit held that courts must construe terms that are susceptible to multiple interpretations, even if the terms are ordinary words.  *O2 Micro*, 521 F.3d at 1363 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.")  It is insufficient to allow the jury to resolve the ordinary meaning of a disputed claim term.  *Id.* at 1361-1364 ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute . . . .  When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

32

1

2

(b)     **Plaintiff's Construction Eviscerates a "Major Part of the Invention" and Renders the Claims Inoperable**

3      Plaintiff's argument reads the specification out of context and ignores the

4  reason for transmitting to all terminals in a cell.  Plaintiff states that "the

5  specification describes broadcasting a signal to a single terminal," to a "plurality of

6  terminals," and to "all terminals," and cites to specific portions of the '253 patent.

7  Plaintiff's Op. Br. at 39-40.  The claims, however, require the broadcast signal to

8  enable the terminals to determine whether to transmit data or to "stop" transmitting

9  data.  The purpose of the alleged invention is to reduce interference by stopping

10  unnecessary transmission by certain terminals within a cell.  This purpose is not

11  accomplished by transmitting to less than all terminals in a cell.

12      The patents teach that the terminal "determines the next operation according

13  to the broadcast signal received."  '253 Patent at 7:44-47.  The "next operation" is

14  either to keep transmitting or to stop transmitting, depending on whether code

15  synchronization has been acquired or not and whether the terminal was transmitting

16  in the same time slot as the broadcast signal.  *Id.* at 4:1-11 ("When the . . . circuit

17  receives a broadcast signal representing the detection of the code synchronization in

18  a time slot from the base station, [1] it holds the data transmission until receiving a

19  broadcast signal representing the code synchronization not acquired when it does

20  not perform data transmission or [2] keeps on transmitting data when it has

21  attempted the data transmission in the time slot corresponding to the broadcast

22  signal or [3] stops the data transmission performed in the time slot not

23  corresponding to the broadcast signal and holds it until receiving a broadcast signal

24  representing the code synchronization not acquired.").[11]

25

---

26      [11]  *See also id.* at 7:48-65 (Upon "receiving the broadcast signal, the terminals

27  that have made the data transmission at the beginning of the first time slot $S_0$ [i.e.,

28  the same time slot as the broadcast signal] keep on transmitting data [while]

(footnote continued)

33

1      The asserted claims recite that the broadcast signal "allow[s] the data

2  transmitter to continue to transmit the data packet if the code synchronization of the

3  data packet is acquired, and allow[s] the data transmitter to stop transmission of the

4  data packets if the code synchronization of the data packet is not acquired," ('253

5  Patent, cls. 34-35), or allows the terminals to determine "whether or not to transmit

6  the first user data," ('530 Patent, cls. 214, 256 and '519 Patent, cls. 55, 79).

7      According to the RACH patents, the purpose of transmitting to *all* terminals

8  in a cell is to allow only those terminals for which code synchronization has been

9  acquired to transmit data, thereby reducing interference:

10       "Hence, the effect of broadcasting thus determined
11       ***broadcast signal to all terminals prevents interference***
         ***signals because the other terminals are stopped to***
12       ***transmit data*** when the code synchronization has been
         attained." '253 Patent at 6:45-49.
13

14       "It is an object of the present invention to provide an
         apparatus . . . which enables the base station to broadcast
15       a signal representing whether it has acquired the
         synchronization signal . . . or no, so as to ***prevent the***
16       ***terminals from unnecessarily transmitting data, thereby***
         ***avoiding interference signals*** generated in the reverse
17       common channel. . . .  It is further another object of the
         present invention to enable the base station to ***broadcast***
18

19

20  _____

21  terminals that have made data transmission at time points other than the beginning
    of the first time slot stop the transmission to attempt retransmission in the time slot
22  at which the next not acquired signal is transmitted.  On the other hand, if the
    broadcast signal represents the synchronization not acquired, the terminal does not
23  perform an additional operation, keeping on carrying out the operation done in the
    previous time slot interval."); 8:15-43 ("Namely, [upon] receiving the detection
24  signal [i.e., broadcast signal], the terminals that have performed data transmission in
    the [same time slot as the broadcast signal] keep on transmitting data while the
25  terminals that have performed data transmission in the other time slots stop
26  transmission, holding until the time slot . . . of receiving the signal not acquired
    from the base station.").
27

28

1
2
3

*the information concerning the state of the channel card to all terminals* in real time so as to *prevent the terminals from unnecessarily transmitting data*." *Id.* at 3:12-37.

4
5
6
7
8
9
10

"Thus, the base station *broadcasts a signal representing the detection of the synchronization* of the data transmitted through the reverse common channel *to all terminals to selectively stop unnecessary data transmission, preventing* the reverse common channel from being affected by the *unnecessary signal interference*. This reduces the signal interference in the radio channel to decrease the power used by the terminal performing data transmission through the exclusive or reverse common channel." *Id.* at 11:45-53.

11
12
13
14

"Therefore, as shown in FIG. 4A, the *detection of the data transmitted [is] transmitted to all the terminals*. . . . In this way, the base station may achieve more precise demodulation of the acquired data in the *reduced signal interference*." *Id.* at 7:41-8:4.

15
16
17
18

Indeed, the named inventor of the RACH patents explained that "broadcast[ing] that information to *all* the terminals . . . within the boundary of the base station . . . would be *one major part of the invention*." Ex. J to Defendants' Op. Br., Kim Transcript at 31, 81-82 (emphasis added).

19
20
21
22
23
24
25
26
27
28

Plaintiff's proposed construction subverts the purpose of the alleged invention—to reduce unnecessary interference generated by terminals within a cell for which code synchronization have not been acquired. If, as Plaintiff's construction contemplates, the broadcast signal was broadcast only to some but not all terminals in a cell, then some terminals in a cell would not receive the broadcast signal and would not know whether, and when, to stop transmitting data. This directly contradicts the patents' teaching that the terminals for which code synchronization have not been acquired stop transmitting data. For example, Figs. 4A-4B show that all the terminals for which code synchronization have not been acquired stop transmitting data and, more specifically, stop transmitting data at the

35

same time. *Id.* at 8:26-30 (Fig. 4A shows that, upon receiving the broadcast signal, "two of seven terminals stop transmission" and Fig. 4B shows that "five [of seven] stop data transmission."); Figs. 4A-B.

(c)   **Plaintiff's Construction Incorrectly Covers Transmission to Only One Device in a Cell**

At a minimum, Plaintiff's construction conceivably encompasses a single device within a cell, which contradicts the common understanding of a person of ordinary skill in the art as reflected in dictionary definitions, including those cited by Plaintiff. "Broadcast" is defined as transmitting to *more* than one device. *See, e.g.*:

- Ex. 14 to Plaintiff's Op. Br., The Computer Glossary (8th ed. 1998) at 41 ("broadcast[:] To disseminate information to ***several*** recipients simultaneously");

- Ex. 15 to Plaintiff's Op. Br., The Int'l Dictionary of Data Communications (1998) at 34 ("Broadcast: The simultaneous transmission of a message to ***multiple*** stations.");

- Ex. 17 to Plaintiff's Op. Br., Data & Telecommunications Dictionary (1999) at 105 ("broadcast[:] To transmit sound, image, or data over distance, in the context of more-or-less simultaneous receipt by a ***larger audience***.");

- Ex. 18 to Plaintiff's Op. Br., Cyber Dictionary (1996) at 38 ("broadcasting[:] Sending information to ***more than one*** receiver at a time over radio waves, a network, or via satellite.");

- Ex. 19 to Plaintiff's Op. Br., Business Dictionary of Computers (John Wiley & Sons, 1993) at 38 ("broadcast: the dissemination of information to ***several*** receivers simultaneously, usually via electromagnetic signals.") (emphasis added).

Even Plaintiff's own expert admits that Plaintiff's construction is wrong to the extent that "any number of terminals" covers a single terminal. *See* Ex. I to

36

Defendants' Op. Br., Vojcic Depo. at 184-185 ("[A] unicast signal [is] different from a broadcast signal [i]n that it is specifically intended only for . . . a single recipient.").

## III.   CONCLUSION

For the foregoing reasons, Defendants respectively request that the Court adopt Defendants' proposed constructions.

Dated:  April 10, 2015                Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN LLP

By: */s/ Kevin P.B. Johnson*
Kevin P.B. Johnson (Bar No. 177129)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Tel: 650-801-5000
Fax: 650-801-5100

*Attorneys for Defendant BlackBerry Limited
f/k/a Research In Motion Limited*


FOLEY & LARDNER LLP

By:  */s/ Jose L. Patiño*
Jose L. Patiño, CA Bar No. 149568
Nicola A. Pisano, CA Bar No. 151282
Christopher C. Bolten, CA Bar No. 268284
*Attorneys for Defendants and Counter-
Plaintiffs HUAWEI TECHNOLOGIES CO.,
LTD., FUTUREWEI TECHNOLOGIES, INC.
AND HUAWEI DEVICE USA, INC.*


PILLSBURY WINTHROP SHAW
PITTMAN LLP

By:  */s/ Nicole S. Cunningham*
Nicole S, Cunningham CA Bar No. 234390
Callie A. Bjurstrom CA Bar No. 137816
Steven A. Moore CA Bar No. 232114
Inge Larish CA Bar No. 276720
Richard W. Thill CA Bar No. 236409
*Attorneys for Defendant and CounterPlaintiff
ZTE (USA) INC.*

1

2    MAYER BROWN LLP

3
     By: */s/ Dale Giali*
4    Dale Giali
5    *dgiali@mayerbrown.com*
     350 South Grand Avenue, 25th Floor
6    Los Angeles, CA  90071-1503
7    Telephone:  (213) 229-9500
     Facsimile:  (213) 625-0248
8

9    Amr O. Aly (*pro hac vice*)
     *aaly@mayerbrown.com*
10   mailto:1675 Broadway
11   New York, NY 10019
     Telephone:  (212) 506-2304
12   Facsimile:  (212) 775-8818

13
     Stephen E. Baskin (*pro* hac vice)
14   *sbaskin@mayerbrown.com*
15   1999 K Street, N.W.
     Washington, D.C. 20006-1101
16   Telephone  (202) 263-3000
17   Facsimile: (202) 263-3300

18
     Edward D. Johnson (SBN 189475)
19   *wjohnson@mayerbrown.com*
     Two Palo Alto Square, Suite 300
20   3000 El Camino Real
21   Palo Alto, CA 94306-2112
     Telephone (650) 331-2000
22   Facsimile: (650) 331-2060

23
     *Attorneys for Defendant*
24   *AT&T MOBILITY LLC*

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ALSTON & BIRD LLP

By:  */s/ Michael J. Newton*
Michael J. Newton (CA SBN 156225)
ALSTON & BIRD LLP
2828 N. Harwood St., Suite 1800
Dallas, TX 75201
Tel.:  214-922-3400; Fax:  214-922-3899
mike.newton@alston.com

Ross R. Barton (pro hac vice)
ALSTON & BIRD LLP
101 S. Tryon Street, Suite 4000
Charlotte, NC  28280
Telephone (704) 444-1000
Facsimile (214) 444-1677
ross.barton@alston.com

*Attorneys for Defendants T-Mobile US, Inc.*
*and Cellco Partnership d/b/a Verizon*
*Wireless*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and forgoing document has been served on April 10, 2015 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any counsel of record who have not consented to electronic service through the Court's CM/ECF system will be served by electronic mail, first class mail, facsimile and/or overnight delivery.

DATED:  April 10, 2015                    By    /s/ Dale J. Giali